[Civ. No. 3440. Fourth Dist. Feb. 10, 1947.]

OLIVER W. HOLMES et al., Respondents, v. SOUTHERN CALIFORNIA EDISON COMPANY, LTD., (a Corporation), Appellant.

44

Gail C. Larkin and E. W. Cunningham for Appellant.

Clifford E. Lewis and E. Eugene Davis for Respondents.

MARKS, J.—This is an appeal from a judgment in favor of Oliver W. Holmes and Leah Holmes, his wife, in the sum of $25,000, and in favor of Theodore R. Gardner and Marguerite Gardner, his wife, in the sum of $2,000 for damages suffered by them in a fire on March 28, 1944, which destroyed a house owned by Mr. and Mrs. Holmes, and such of its contents as was owned by them, and furniture and personal effects owned by Mr. and Mrs. Gardner.

No witness knew the exact date of the erection of the house but one witness estimated that from its construction and general type it must have been built about 1913. It was of good materials and construction according to the customs and usages of that period.

The house faced east of north. The main portion was two-story with a living room, den, dining room, bedroom, bath and closets on the first floor, and three or four bedrooms, hall and closets on the second floor. There was a one-story portion on the rear which contained the kitchen, service porch and a closet.

Electricity was first used in the house in 1931. Three service wires were run to it by defendant and were connected to the house wiring. They ran from a pole northeast of the house to insulators on a brace on the upper portion of the southeast corner of the two-story part, thence down to insulators on the five-foot roof over-hang of the one-story part where they were connected to three stranded wires which ran under the roof, through the rear wall of the service porch and connected with a meter which was owned by defendant. There is considerable argument about the ownership of these stranded wires. They were not in a conduit, which construction was permissible when the wiring was installed in 1931. We have studied the entire record and believe that the only reasonable inference to be drawn from the evidence is that these stranded wires were part of the house wiring and were not owned or controlled by defendant.

Mr. and Mrs. Holmes purchased the property in February, 1941, for $7,000. It consisted of between 60 and 75 acres of land, the house and other improvements.

The house was in very poor repair at that time. Bees had swarmed in the north and west walls and bats had gathered in the east wall necessitating the removal and reconstruction of this portion of the exterior. A new roof and new floors were installed and many other improvements made at a total cost of between $6,000 and $6,500, according to Mr. Holmes. These repairs were completed during May, 1941. The electric wiring was extended to new outlets but otherwise was not changed. Mr. Holmes testified that, other than the particulars already mentioned, the house structurally was in good condition; that the dimension lumber used in it was unusually large and was sound.

Mr. Holmes installed a new electric stove and a new electric water heater. An electrically operated pumping plant situated about 150 feet from the house was fed through the house meter. The plant was capable of producing about 150 inches of water.

The house was situated on the top of a small hill where it was exposed to frequent winds, especially winds from the desert which during certain periods often reached considerable velocity.

There was considerable sag in the feed wires leading from the pole to the house. Mr. Holmes and other witnesses testified that when the wind was blowing these wires were so loose they would tangle; that ordinarily they were untangled by a person standing on the ground and using a broom handle with which to reach them.

These were number four weather-proof wires with three-ply insulation. Witnesses for plaintiffs testified that prior to the fire the insulation was in poor condition; that some of it was hanging down in strips and that in one place one wire was bare of insulation so the copper wire was exposed; that for about a year prior to the fire the lights in the house would flicker and the radio would growl when a wind was blowing; that frequent complaints were made of these conditions to the agents of defendant but nothing was done to correct them.

On the day of the fire Mr. and Mrs. Holmes were in Los Angeles, leaving Mr. and Mrs. Gardner the sole occupants of the house. There was a strong, dry desert wind blowing. Mr. and Mrs. Gardner had their lunch and repaired to the living room where Mr. Gardner, who was in poor health, rested and Mrs. Gardner worked with an electric sewing

machine. Just how long she used it or how long before the discovery of the fire she stopped using it is not determinable from the record. After she stopped using the sewing machine no other electric current was in use and there was no fire in the house.

Mrs. Gardner left the living room and started up the stairs to the second floor when she noticed a peculiar odor. She returned to the kitchen to see if she had left a burner of the stove energized with some cooking utensil over it. All electric outlets were turned off. She went up the stairs to the second floor and into her bedroom at the southeast corner of the house. Through the south window of this room she saw flames on the outside. While it is not definitely determinable, it may be probable, that the flames were coming from the one-story part of the house near one of the points of attachment of the service wires of defendant. She called to her husband telling him the house was on fire, telephoned the fire department and Mr. and Mrs. Holmes and then proceeded to throw water on the fire. Mr. Gardner went to the back of the house and attempted to attach a hose to a hydrant but the flames spread so rapidly that he had to abandon this effort. The house was entirely destroyed, together with its contents, except some furniture which had been carried out by neighbors. All furniture taken out belonging to Mr. and Mrs. Holmes was ruined either by being broken in the process or by being left too close to the burning house and being partly or totally consumed by the fire or by sparks from it. A few pieces belonging to Mr. and Mrs. Gardner were saved.

A fireman from Corona reached the scene shortly after the fire was discovered. He climbed the electric power pole and cut the service wires leading to the house. The power lines on the high side of the transformer carried 11,000 volts. The fuses in the transformer were not blown. The insulation on the house ends of the service wires was burned off for a number of feet.

■ Defendant first seriously argues that the evidence is insufficient to show any negligence on its part or that the fire was of electrical origin. The evidence on this question is sharply conflicting and the conflict is irreconcilable. The trial started on November 13th and was concluded on November 29th, 1945, so it is impossible to summarize the testimony of the various witnesses in an opinion of conscionable length.

It should be sufficient to say of the testimony offered by defendant, had it been accepted as true by the jury, that it would have entirely absolved defendant from all responsibility for the fire and no judgment against it could have been sustained. However, as we have observed there is a sharp conflict in the evidence as to the cause of the fire, and conflicts in the evidence are addressed to and settled by the trier of fact and not in an appellate court. Our sole duty is to determine if there is substantial evidence in the record supporting the inference drawn by the jury that the fire was of electrical origin and was a result of the negligence of defendant in the maintenance of its service wires.

We have already pointed out evidence indicating the dilapidated condition of the insulation of the service wires. It was further developed that one of the service wires had been spliced, the splice taped and the tape loosened so that a short portion of the wire in the splice was exposed.

After the fire the service wires and some of the stranded wires were removed by defendant and taken to Los Angeles where they were examined by experts and various experiments performed with them or with similar wires. Various lengths were cut off from one of these wires. One of the service wires was burned in two less than two feet from its end on the house.

Plaintiffs produced a mechanical and electrical engineer of many years' experience who examined the wires produced in court by defendant. He was of the firm opinion that the wire was burned in two by an electrical short and not from the heat of the fire. He based this opinion on two facts: First, on the appearance of the ends of the severed segments; and second, that the heat from the fire was not sufficient to melt the copper wire in two. He testified that it required a heat of from 1,700 to 1,800 degrees to melt the copper; that the heat generated by the fire from a burning building of the construction here involved, with the fire unconfined, as was the case here, would be from 1,200 degrees to 1,400 degrees; that such a temperature was not sufficient to melt the copper. He also testified that an electrical short for a brief time would produce heat without blowing the fuses in the transformer.

He agreed with the experts for defendant that the service wires with three coats of insulation intact could come into contact without producing a short circuit. He could find no

wire other than the one burned in two that showed electrical burns but remarked that one segment of wire seemed to be missing. He also testified that if the two outer layers of insulation had been stripped off leaving but one layer, and if that portion of a wire came into contact with a bare wire, a serious short circuit would result sufficient to cause a fire. He further testified that the insulation on the wires was inflammable and would ignite at a temperature of about 600 degrees; that in a strong wind the fire in the insulation would burn along the wire for a number of inches before it burned itself out.

The foregoing evidence is substantial and supports the conclusion drawn by the jury that the fire was of electrical origin and was caused by the negligence of defendant in the poor condition in which it maintained its service wires leading from the pole to the Holmes house wiring.

Defendant next contends that the award of $25,000 damages in favor of Mr. and Mrs. Holmes is so excessive as to show such passion or prejudice on the part of the jury that the judgment should be reversed. It does not contend that the award of $2,000 to Mr. and Mrs. Gardner is excessive.

We regard the award of $25,000 to Mr. and Mrs. Holmes most liberal to say the least. The evidence of Mr. and Mrs. Holmes would have supported a reduction in those damages by the trial judge by a sum not exceeding $10,000 on the motion for new trial if such a reduction had been made.

In the original complaint filed in this action, verified by Mr. Holmes, the damages to them were alleged to be $19,463.28. In the first amended complaint, also verified by Mr. Holmes, damages by reason of the loss of the house were placed at $9,695.48 and of the personal property at $9,767.80. Late in the trial these allegations were amended to conform to the proof and damages by reason of the loss of the house were raised to $17,000 and of the personal property to $15,000.

Early in the trial Mr. Holmes testified that the total value of the property before the fire, including the personal property in the house, was between $35,000 and $37,000 and that after the fire its value was $20,000, showing the loss from the fire to be between $15,000 and $17,000. Just before the close of the trial he was recalled to the stand and testified that these values represented the money invested and did not represent values at the time of the fire. It needs no evidence to demonstrate that values of the building and personal property

had increased by March 28, 1944, over the values in the spring of 1941. This is common knowledge of every person who has had to consider the problem of either building, improving, repairing, buying or selling a house or of furnishing one.

Mr. Holmes also testified as to the value of the personal property in the various rooms and closets in the house with the exception of one room and two closets or storage rooms. He placed the total of these values at between $15,085 and $17,995.

Mrs. Holmes testified in considerable detail as to the personal property in the house; that the reasonable market value of the personal property belonging to herself and her husband was between $12,000 and $15,000. All witnesses agreed that the house was unusually well furnished.

Mrs. Holmes also testified that once each year she and her husband went to stores and purchased an entire year's supply of canned goods at one time; that at the time of the fire the storage room was full of cases and cases of canned goods of considerable value. She failed to explain how this could have been done during the years that food rationing was in effect.

To refresh her memory Mrs. Holmes used a list of the personal property in the house which she said she prepared with the aid of her husband a few weeks after the fire. A value was placed on each article. The total of these values was $9,767.80, which equals the total damage to personal property alleged in the first amended complaint. Counsel for defendant used this list in cross-examination of Mrs. Holmes and it was offered by plaintiffs and admitted in evidence over the objection of defendant. It is now admitted that the list contained fixtures of the estimated value of $171 which were part of the realty and were not personal property.

■ The powers and duties of a trial judge in ruling on a motion for new trial and of an appellate court on an appeal from a judgment are very different when the question of an excessive award of damages arises. The trial judge sits as a thirteenth juror with the power to weigh the evidence and judge the credibility of the witnesses. If he believes the damages awarded by the jury to be excessive and the question is presented it becomes his duty to reduce them. (*Fisher* v. *Zimmerman*, 23 Cal.App.2d 696 [73 P.2d 1243]; *Sassano* v. *Roullard*, 27 Cal.App.2d 372 [81 P.2d 213].) When the question is raised his denial of a motion for new trial is an indication

that he approves the amount of the award. An appellate court has no such powers. It cannot weigh the evidence and pass on the credibility of the witnesses as a juror does. To hold an award excessive it must be so large as to indicate passion or prejudice on the part of the jurors. Generally speaking, in cases of this kind, when damages are recovered for the destruction of property, if there is substantial evidence in the record supporting the damages awarded by the jury and it is inferentially approved by the trial judge by his denial of a motion for new trial without reducing the damages, we are powerless to reduce them or to hold the award excessive. Therefore we must examine the evidence on the value of the property lost by Mr. and Mrs. Holmes in the fire.

As we have already seen Mrs. Holmes placed a value of between $12,000 and $15,000 on the personal property destroyed and Mr. Holmes placed a value on the major portion of it of between $15,085 and $17,995. If this evidence was competent and substantial, which question is raised by defendant and will be considered later in the opinion, there is evidence to support an award of $15,000 for the loss of the personal property which is the amount of that damage alleged in the amendment to the complaint.

There is no direct evidence as to the value of the house. Mr. Holmes testified that at least the frame, including the dimension timbering was in good condition when he rebuilt so there must have been some value there. He testified that he spent between $6,000 and $6,500 in rebuilding. A witness for defendant testified that costs for houses of similar construction had increased $1.58 per square foot between 1941 and the time of the fire. There were approximately 2,300 square feet in the house which would make an increase of $3,634 over construction in 1941. This added to the $6,500 reconstruction cost would give $10,134, without any allowance for the value of the framework and other parts of the house that were used in reconstruction. Thus we cannot say that an allowance of $10,000 for the loss of the house would be without evidentiary support.

The loss from the destruction of the personal property, $15,000, with the proved loss from burning the house, $10,134, totals $25,134, or more than the amount awarded by the jury. Of course there is much evidence in the record of less values than those we have just indicated. This merely creates a conflict which was settled in the trial court. Under these circum-

stances we cannot say that the amount of damages awarded is so excessive as to indicate passion or prejudice on the part of the jury although we agree with defendant that the award is high.

Defendant argues there is no competent evidence to support the implied finding as to the reasonable market value of the personal property lost. It argues that Mr. and Mrs. Holmes had no special knowledge of such market value and that instead of being permitted to give their estimate of the total loss they should have first detailed each item of property lost and should have given its market value. In this connection it should be observed that both witnesses went into considerable detail in descriptions of various articles lost and placed values upon each, but not all of them. Their cross-examination was not limited.

Under the rule prevailing here an owner of property is allowed to estimate its worth whether or not he has any special knowledge of such values. (*Hood* v. *Bekins Van & Storage Co.,* 178 Cal. 150 [172 P. 594]; *Willard* v. *Valley Gas & Fuel Co.,* 171 Cal. 9 [151 P. 286].) We can see no good reason why the owners of property destroyed by fire should not be permitted to give their estimate of the total value of such property before giving an estimate of the value of the items destroyed either on direct or cross-examination. (*Razzo* v. *Varni,* 81 Cal. 289 [22 P. 848]; *Ward* v. *Sherman,* 155 Cal. 287 [100 P. 864].)

Defendant argues that it was error to overrule its objection to the admission in evidence of the list of personal property destroyed, with the values of the various articles appearing on the list we have mentioned, as it was in effect a self-serving declaration of Mr. and Mrs. Holmes. If this argument be sound we can see no prejudice suffered by defendant from the introduction of the list in evidence. As we have observed, the list was prepared by Mr. and Mrs. Holmes shortly after the fire and the total value of the articles listed was $9,767.80 which tended to impeach the testimony of Mr. and Mrs. Holmes that the total value of the personal property destroyed was between $12,000 and $17,995. If the document had been offered by defendant as a declaration against interest and as impeaching Mr. and Mrs. Holmes, it would have been properly admitted. We can see no prejudice to defendant from admitting the same evidence when offered by plaintiffs.

■ Defendant complains of rulings by the trial court excluding evidence of its custom requiring its customers to bring the house wiring to the outside of the house, and in excluding defendant's rules and regulations to the same effect filed with the Railroad Commission.

We believe this evidence should have been admitted as it bore on the ownership of the stranded wires we have mentioned. (*Whittemore* v. *Lockheed Aircraft Corp.*, 65 Cal. App.2d 737 [151 P.2d 670] ; *Shearer* v. *Pacific Gas & Electric Co.*, 43 Cal.App.2d 306 [110 P.2d 690].) However, we can see no prejudice in the ruling as a careful study of the entire record leaves no doubt in our minds that these stranded wires were part of the house wiring belonging to Mr. and Mrs. Holmes and that defendant had no responsibility for them. Further, the evidence offered by plaintiffs points to but one conclusion, namely, that the fire originated from defects in the service wires owned and under the control of defendant.

■ Defendant complains of instruction number 34 which concludes as follows: ". . . if . . . you find it to be more probable that the fire was caused as a result of a broken or defective wire owned by the defendant herein than from any other cause, your finding upon that point, to-wit: the origin of the fire, should be accordingly."

Defendant argues that this instruction permitted the jury to speculate and compare all probable causes of the origin of the fire and nullified the well recognized rule requiring plaintiffs to prove negligence of defendant and its causal connection with the fire by a preponderance of the evidence. The wording of the instruction lends considerable support to this argument. However, it is taken from an instruction considered and approved in the case of *Liverpool, London & Globe Ins. Co.* v. *Southern Pacific Co.*, 125 Cal. 434 [58 P. 55], where the same argument was made and rejected by the Supreme Court. We are bound by and must follow the decision of that court. (See, also, *Quint* v. *Dimond*, 147 Cal. 707 [82 P. 310].)

Defendant complains of instructions numbered 21, 27, 28 and 29, given at the request of plaintiffs. We will only quote two of them.

■ Instruction number 21 reads as follows:

"Owing to the highly destructive power of electricity when carried in quantities sufficient for power purposes and to the fact that it is not visible to the eye or apparent to the other

senses, a company maintaining an electric power transmission line is required to exercise a high degree of care in placing and maintaining its wires so as to avoid contact with and injury to any person or property. The standard to be attained is that of ordinary and reasonable care, and this means such care as a reasonably careful and prudent man, having in view the dangers to be avoided and the likelihood of injury therefrom, would exercise under the circumstances, in order to prevent injury. Where injury may be caused by an agency lawfully in use, ordinary care required that every means known, or that with reasonable inquiry would be known, must be used to prevent it.''

 Instruction number 28 is as follows:

''You are instructed that it is the duty of an electric power company which places wires upon the property of others for the transmission of electricity to use all reasonable care which is necessary to prevent the electricity from escaping or damaging the property of others. Failure of such an electric power company to use such reasonable care as may be necessary to prevent injury, is negligence.

''It is the duty of such electric power company not only to make transmission of such electrical energy safe by proper installation of transmission facilities, but it is also the duty of such company to thereafter keep such transmission lines in constant oversight and repair.''

Instruction number 27 is along the same line but required defendant to use ''great care to see that injury is not caused'' and to ''guard against them by the exercise of all the foresight and caution which can be reasonably expected of prudent men under the circumstances.''

 Instruction number 29 required defendant ''to use the highest degree of care practicable to avoid injury to the property of others or the property of its customers'' and to ''use the highest or utmost degree of care in the construction, maintenance and operation of said wire, and he must use the best materials and most approved methods of construction to prevent injury to the property of others or to its customers.''

It must be admitted that these instructions might have been more happily worded. However, electricity is a dangerous instrumentality. While section 1714 of the Civil Code makes a person responsible for injury caused by ''want of ordinary care or skill in the management of his property,''

what is ordinary care must vary with the circumstances. An ordinarily prudent person should anticipate that danger to others is more likely to occur when he is handling an inherently dangerous product than when he is dealing with something which in itself is harmless.

Instruction number 21 closely follows the language of *Fairbairn* v. *American River Electric Co.*, 179 Cal. 157 [175 P. 637], and the same case reported in 170 Cal. 115 [148 P. 788], which cites with approval *Perham* v. *Portland General Electric Co.*, 33 Ore. 451 [53 P. 14, 24, 72 Am.St.Rep. 730, 40 L.R.A. 799], in which an instruction as drastic as any given in the instant case on this subject was approved. (See, also, *McCormick* v. *Great Western Power Co.*, 214 Cal. 658 [8 P.2d 145, 81 A.L.R. 678]; *Sweatman* v. *Los Angeles Gas & Electric Corp.*, 101 Cal.App. 318 [281 P. 677].)

In *Bergen* v. *Tulare County Power Co.*, 173 Cal. 709 [161 P. 269], an instruction requiring a power company to use "very great care" in its operations was approved so we cannot regard the use of "great care" in instruction number 27 as reversible error. (See, also, *Stott* v. *Southern Sierras Power Co.*, 47 Cal.App. 242 [190 P. 478].)

The principal complaint of instruction number 28 is that it made defendant an insurer against injury. This instruction follows the rule laid down in *Robinson* v. *Western States Gas & Electric Co.*, 184 Cal. 401 [194 P. 39]; *Tackett* v. *Henderson Bros. Co.*, 12 Cal.App. 658 [108 P. 151], and *Howell* v. *San Joaquin Light & Power Corp.*, 87 Cal.App. 44 [261 P. 1107].

Instruction number 29 closely follows the rule announced in *Tackett* v. *Henderson Bros. Co., supra,* which has been cited with approval in *Bergen* v. *Tulare County Power Co., supra,* and *Stasulat* v. *Pacific Gas & Electric Co.*, 8 Cal.2d 631 [67 P.2d 678].

We can well close this phase of the case with the following quotation from *Polk* v. *City of Los Angeles,* 26 Cal.2d 519, at page 525 [159 P.2d 931]:

"On the subject of negligence the standard of care is, that one maintaining wires carrying electricity is required to exercise the care that a person of ordinary prudence would exercise under the circumstances. Among the circumstances are the well known dangerous character of electricity and the inherent risk of injury to persons or property if it escapes. Hence, the care used must be commensurate with and proportionate

to that danger. (Citing cases.) Specific application of that standard requires that wires carrying electricity must be carefully and properly insulated by those maintaining them at all places where there is a reasonable probability of injury to persons or property therefrom. (Citing cases.) Upon those controlling such instrumentality and force is imposed the duty of reasonable and prompt inspection of the wires and appliances and to be diligent therein. (Citing cases.) And, in the places where there is a probability of injury, they must not only make the wires safe by proper insulation, but as stated in *Dow* v. *Sunset Tel. & Tel. Co.*, 157 Cal. 182, 186 [106 P. 587], 'keep them so by vigilant oversight and repair.' "

Defendant complains of instruction number 36 because it permits recovery in "such sum as will reasonably compensate said plaintiffs for the property lost or destroyed in, or because of, the fire." Defendant points to evidence showing that a considerable part of the furnishings were carried out from several of the first floor rooms. It argues that some of this furniture could not be found after the fire and was not accounted for. Particular emphasis is placed on a valuable Oriental rug which was carried out of the living room.

We do not so construe the testimony of Mr. and Mrs. Holmes as to the loss of their property. They admit that furnishings were carried out of the burning building by neighbors. They testified that much of it was placed so close to the building that it caught fire and was burned or ruined. They could find only small pieces of the rug, the rest of it having been burned. They also testified that other furniture was broken and rendered useless when being carried out; that all of their personal property was either burned or broken beyond usefulness.

Of course no legitimate question can be raised as to the right of the plaintiffs to recover for furnishings destroyed by fire after it had been carried out of the house, and no sound reason has been advanced why they should not be able to recover for furniture ruined in being carried out of the house. Neighbors are willing but usually excitable workers in endeavoring to save the furnishings of a burning home. They are unskilled and in the excitement of the occasion breakage is not only a foreseeable but a probable result of a fire. Under the circumstances appearing here where practically all of the belongings of Mr. and Mrs. Holmes were either burned or

58

rendered useless as a result of the fire we can see no prejudicial error in the instruction.

When all of the instructions are read together we see no error in them that is sufficiently prejudicial to warrant a reversal of the judgment.

The judgment is affirmed.

Barnard, P. J., and Griffin, J., concurred.

A petition for a rehearing was denied February 28, 1947, and appellant's petition for a hearing by the Supreme Court was denied April 3, 1947. Traynor, J., voted for a hearing.