[Civ. No. 16552.   Second Dist., Div. One.   Feb. 21, 1949.]

LEONARD EUGENE HUMBLE, Respondent, v. UNION PACIFIC RAILROAD COMPANY (a Corporation), Appellant.

E. E. Bennett, Edward C. Renwick and Malcolm Davis for Appellant.

Hildebrand, Bills & McLeod and D. W. Brobst for Respondent.

WHITE, J.—The sole question presented by this appeal from the judgment is whether the sum of $20,000 damages awarded by the jury is excessive.

Plaintiff and respondent, married and the father of two children, was a fireman employed by defendant and appellant railroad company. He was injured on December 18, 1946, at Lund, Utah. Plaintiff was standing on top of the tender of an engine taking on water when the tender was struck by another train, causing him to fall from the tender and strike his head on the coupler between tender and engine. Upon the trial of the action, brought under the Federal Employers' Liability Act (35 Stats. 65, 45 U.S.C.A. § 51 et seq.), liability was admitted, and the only evidence received was upon the issue of damages.

The question of the amount of damages awarded is committed in the first instance to the exercise of a sound discretion by the jury, and their determination of the question may not be set aside on appeal unless it appears that the award, under the facts present, is so disproportionate to the injuries sustained that it shocks one's sense of justice, thereby raising the presumption that it was the result of passion, prejudice or corruption, rather than sober judgment on the part of the triers of fact. (*Roedder* v. *Rowley,* 28 Cal.2d 820, 823 [172 P.2d 353] ; *Johnston* v. *Long,* 30 Cal.2d 54 [181 P.2d 645] ; *O'Neal* v. *Kelly Pipe Co.,* 76 Cal.App.2d 577, 586 [173 P.2d 685].) And, as was said in *Holmes* v. *Southern Calif. Edison Co.,* 78 Cal.App.2d 43, 51 [177 P.2d 32], ''The powers and duties of a trial judge in ruling on a motion for new trial and of an appellate court on an appeal from a judgment are very different when the question of an excessive award of damages arises. The trial judge sits as a thirteenth juror with the power to weigh the evidence and judge the credibility of the witnesses. If he believes the damages awarded by the jury to be excessive and the question is presented it becomes his duty to reduce them. (*Fisher* v. *Zimmerman,* 23 Cal. App.2d 696 [73 P.2d 1243] ; *Sassano* v. *Roullard,* 27 Cal. App.2d 372 [81 P.2d 213].) When the question is raised his denial of a motion for new trial is an indication that he approves the amount of the award. An appellate court has no such powers. It cannot weigh the evidence and pass on the credibility of the witnesses as a juror does. To hold an award excessive it must be so large as to indicate passion or prejudice on the part of the jurors. Generally speaking, in cases of this kind, when damages are recovered for the destruc-

tion of property, if there is substantial evidence in the record supporting the damages awarded by the jury and it is inferentially approved by the trial judge by his denial of a motion for new trial without reducing the damages, we are powerless to reduce them or to hold the award excessive.''

Therefore, we must examine the evidence on the nature and extent of respondent's injuries, and unless we can say that the jury's award of damages was so grossly disproportionate to any reasonable limit of compensation warranted by the facts, we are powerless to reduce them or to hold the award excessive.

■ We believe the following to be a fair summary of the evidence adduced on behalf of respondent as to the nature, extent and probable duration of his injuries and the elements of special damage:

After his fall he was unconscious for about two and one-half hours and afterwards was sick to his stomach. Following the accident he was taken to the depot at Lund, Utah, where he remained for 13 hours and 50 minutes without medical attention. During this time he was in considerable pain and had no feeling in his left arm or shoulder. From the depot he was taken to his hotel at Milford, Utah, where he remained a short time and was then removed to a hospital at Milford, where he was given some diathermy and X-rays were taken of his back and shoulder. He then returned to his hotel for three days, when he was carried out on a stretcher and sent to the railroad company's hospital at Salt Lake City, where he remained for five days; he was then sent to a hotel where he stayed for two weeks completing a series of ''shots'' administered by the company doctors. He was then sent to Los Angeles, where he received further treatment from defendant's Dr. Giboney, until March, 1947.

Dr. Edgar B. Spear, the only doctor who testified, was called by the plaintiff. He first examined plaintiff on January 30, 1947, at which time plaintiff complained of having continual pain in the back of his head; that his left shoulder was hurt but was better; that he had had paralysis of the left arm for several days after the accident. Plaintiff also complained that he felt as if there were no power in his back and that if he sat up for any length of time he had increasing pain in his back. He also complained of continual headaches and that he had lost approximately 25 pounds in weight. The doctor found a half-inch laceration scar on the mid portion of his forehead. He also found a nystagmus, or wavering of the

eyes, indicating an involvement of the nerves controlling the eyes, and a slight spasm or contracture of the muscles of the lower back. He appeared to be nervous and was not particularly stable, moving about with more or less of a jerky type of movement. X-rays taken by the doctor disclosed no bone injury. The doctor's diagnosis of a cerebral concussion was based on the subjective symptoms, the fact that he was unconscious for a considerable period, and the residual difficulties of headache, nystagmus and nervous condition.

Dr. Spear next saw the plaintiff on June 12, 1947, and noted that his nervous condition was considerably worse; there was a considerable amount of tremor in his tongue and eyelids; he complained of continual pain in the back and that his headaches were worse, that he was losing sleep and had nightmares which kept him awake. In November, 1947, the doctor noted a marked improvement, in that he had materially quieted down and was not nearly as nervous; his headaches had improved considerably and his back felt somewhat better. However, he stated to the doctor that when he sat in the cab of the engine for any period of time his back began to pain. He had been wearing a belt which had relieved the soreness in his back. He complained that at times he had a feeling of numbness behind his left ear which would last for several minutes and would then disappear, which complaint the doctor could account for only on the basis of some ''neurotic condition.''

With respect to the plaintiff's general condition at the time of trial, the doctor testified that he was still 26 pounds underweight according to what he stated his weight was when injured; although his nervous condition was materially improved, he still was considerably nervous. ''He does have some neurosis. He has had considerable headaches and his injuries, coupled with other domestic worries and so forth, have kept him in a nervous state.'' He still had some difficulty from the sprain of the sacrolumbar joint, but it was in process of clearing up and would clear up within a few months. The doctor explained a neurosis as a state of mind, which has nothing in particular to do with any actual injury, but develops following certain experiences that an individual goes through; that the best treatment is to eliminate the cause. ''In a case of this type, a certain amount of rest; a man rehabilitating himself; going back to work and finally finding out that he can carry on with his work; that he can make a livelihood and not be a burden to his family. . . . there is no

definite time limit (for recovery from the neurosis), but that usually is up to the individual how long it takes the individual to get control of himself.''

The only other witness in the cause was the plaintiff himself, who testified to his experiences immediately following the injury, as hereinbefore narrated. He further testified that he tried to go back to work in March, 1947, and made one trip, but that his back hurt him so that his eyes were so filled with tears that he was unable to see. He reported this condition to Dr. Giboney, who prescribed medicine and an exercise routine. In August, 1947, plaintiff began work on passenger trains, but stopped after two weeks because the high speed and vibration of the engine adversely affected his back injury. He was then obliged to take a job on a Diesel switch engine over a three-quarter of a mile track at Cedar City, Utah, which required no physical exertion, but which nevertheless caused pain in his back although he was wearing the prescribed brace. In September of 1947 he qualified as an engineer, but testified that he was unable to take an engineer's position because of his nervous condition and lack of confidence in his judgment. ''I am still afraid.''

With respect to loss of earnings and additional living expense since the accident, plaintiff testified that by taking the Diesel job at Cedar City he had to leave his wife and two children at Los Angeles because there was no place for them to stay at Cedar City, and that living apart from his family increased his living expenses $150 per month; that the Cedar City job was the best he could get in his condition with his seniority. His earnings prior to the accident were: April, 1946, $212.25, May $266.96, June $181.16, July (when a raise went into effect) $369.09, August $133.99. He was on leave from August 30 to October 15. For the balance of October $176.45, November $312.64, December 1 to 18, $210.05. After the accident his earnings were: August 9 to 31, 1947, $195.68, September $275.48, October $394.87.

Plaintiff testified that as of the time of trial the pain in his back had not subsided; that he was still wearing the belt prescribed by the company doctor; that he had not regained much of his weight; that his nervous condition was not getting any better; that he was unable to relax and that there was a continual recurrence of a feeling as though hot water had been poured on the back of his head followed by a numbness in that region.

We are impressed that in all fairness it must be conceded that the foregoing facts establish a very substantial injury to plaintiff, an injury that was causing him considerable damage, disability and pain at the time of trial, some 11 months after the accident. There was evidence that at the time of trial plaintiff was suffering from a neurosis which not only prevented him from securing a better-paying job, but also prevented him from taking advantage of his qualifications as an engineer, and which, according to the evidence, made it necessary for him to live away from his family. Concerning the pain and suffering endured by plaintiff following his injury, there was testimony that for six months he suffered through a paralysis of his left arm and very severe headaches. That he suffered constant pain in the lower part of his back, which continued to a considerable degree when he attempted to return to work in the early part of March, 1947. A fair inference to be drawn from the evidence is that because of his injuries plaintiff was losing approximately $150 per month at the time of trial and would continue to suffer such damage for an indefinite period thereafter. Furthermore, the jury and the trial judge had the opportunity, denied to us, to see the plaintiff and hear his testimony at the time of trial, to observe his appearance and any physical evidence of his claimed condition of health at that time as the result of his injuries.

With regard to a prognosis in his case, there appears no definite medical opinion as to when plaintiff would recover from his ailments. There was testimony that the injury to his back might be cured within several months, but so far as his neurotic condition and mental condition were concerned, the time of his recovery therefrom was pronounced indefinite and problematical.

Appellant urges that the action of the trial judge in declining to reduce the verdict on motion for new trial should not be given "undue weight" for the reason that trial judges in Los Angeles County work under a very considerable pressure of business; that the motion for new trial is not usually heard until 60 days after the verdict, and that on occasion the trial judge may rule on the motion "without a clear recollection of the evidence in the case." This argument should not affect the weight to be given by an appellate court to the ruling of the trial judge on a motion for new trial. It is further argued that the failure of the defendant to call any witnesses may have misled the jury, although it was explained that

defendant's doctor who treated plaintiff could not be reached because he was on vacation in Mexico. To so hold would require us to wander far into the field of conjecture and speculation.

The verdict is undoubtedly substantial, and might even be regarded as high. But the question of what may be reasonable compensation in a case of this kind is a matter on which there undoubtedly may be a wide difference of opinion. Viewing the evidence most strongly in favor of plaintiff, as we are required to do, and give him the benefit of all reasonable inferences, we cannot say that the amount awarded by the jury in this case is so large as to indicate that it was the result of passion or prejudice.

The judgment is affirmed.

York, P. J., and Doran, J., concurred.