[Civ. No. 13977.   First Dist., Div. One.   Mar. 28, 1949.]

VICTOR V. MONTERROSA, Respondent, v. GRACE LINE, INC. (a Corporation), Appellant.

Williamson & Wallace and William R. Ray for Appellant.

Albert Michelson and Newell J. Hooey for Respondent.

BRAY, J.—In an action for damages for personal injury under the Jones Act (38 Stats. 1185, 46 U.S.C.A. § 688) a jury awarded plaintiff judgment against defendant Grace Line, Incorporated, in the sum of $30,000. The court denied defendant's motion for a new trial upon remittance by the plaintiff of that portion of the verdict in excess of $23,500. Defendant appeals from the judgment and from the order denying a new trial. No appeal lies from the latter order.

There are only two questions presented: (1) sufficiency of the evidence; and (2) alleged excessiveness of the verdict.

## FACTS

Plaintiff is 24 years old and licensed as an able seaman. In December of 1946, he signed on as a member of the crew of the Coastal Nomad, which left San Francisco in January, 1947. After several stops, it reached La Union, El Salvador. The day before arriving there the jumbo boom was rigged on the port side for the purpose of unloading some heavy equipment at La Union.

The boom is a large beam attached and hinged near the bottom of a mast. It can be placed at any desired angle from the horizontal. It can be held in such a position and lifting and lowering done by means of pulleys. The movement of the boom itself or of the hook is controlled by electric winches. There are also "guys" running from the boom to each side of the ship. At each side the guy passes through a block, with a wheel inside, and thence to a winch. The boom is moved *sidewise* by one winch operator "heaving" on his line,

and the other slacking. The block on each side must be attached in some manner to a "king-post" or stanchion. On each king-post is a pad eye, i. e., eye bolt on a metal plate.

There were three heavy pieces of cargo to be discharged at La Union. On the port side of the ship the block was attached to the king-post by means of a shackle (U-shaped piece of metal placed through the pad eye on the king-post, and a pin, which joined the ends of the shackle, placed through a hole or groove in the block.) A shackle was normally used for this purpose.

On the starboard side of the ship the guy was not attached to the king-post with a shackle, because the crew could not find a proper sized pin. Instead, a wire cable strap was used. The strap was about 4 feet long and five-eighths of an inch in diameter. One looped end was forced through the pad eye and the other through the block. The two looped ends were then coupled with a shackle.

When the ship came alongside the dock, loading and unloading of cargo was done by a stevedoring company, International Railways of Central America. Employees of the stevedoring company operated the winches and performed all acts necessary in moving the cargo from the ship to the dock. The injury occurred on January 20, 1947, at about 2 in the afternoon. All of the loading and unloading had been completed, and the crew was securing the jumbo boom in preparation for putting to sea. The winches were still being operated by employees of the stevedoring company. There was testimony that these employees erroneously heaved on the port guy, without slacking on the starboard guy. At any rate, the strap holding the starboard block to the starboard king-post broke and the starboard guy block flew across the ship to the port side and struck plaintiff. His injuries will be discussed later.

### SUFFICIENCY OF THE EVIDENCE

■ Defendant contends that plaintiff failed to prove, as required by the Jones Act, that the accident was due to the negligence of the defendant, and claims that the sole proximate cause was the negligence of the winch operators who were in the employ of the stevedoring company. ". . . the exact *cause* of the injury was the action of two native stevedores in putting winches in operation to exert opposing forces of at least five tons each on gear that was used to move the boom." (Appellant's opening brief, p. 3.)

Having in mind the rule as set forth in *People* v. *McKnight,* 87 Cal.App.2d 89 [196 P.2d 104],—"The duty of this court is expressed in *People* v. *Pratt,* 77 Cal.App.2d 571 [175 P.2d 888], where the court at page 576 quotes from *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778], as follows: ' "*We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict*" ' "—there is sufficient evidence to support the conclusion that the accident was proximately caused by the joint negligence of the stevedores and the defendant. The following is some of that evidence: The use of a wire or strap was not customary. It was only used because a pin for the shackle could not be found. The boatswain testified that it was not customary to use a strap and that they never used one if they possibly could help it. One Captain Greenleaf, an expert called by plaintiff, testified that it was not customary to use a strap of the type used here, "if it could possibly be avoided" and that if used the gear should be inspected by an officer throughout the day while in use. In use there was a "possibility of chafing of the strands" and there would be wear on the strap where it went through the block. He further testified: "Well, it is obviously quite an old piece of wire. It is being subjected to considerable strain, and it appears to be—I would say that it was—it could be depended on very far." It is obvious that Captain Greenleaf meant that it could *not* be depended on very far. The bending of the wire necessary for it to be used as it was, reduced its strength. The break was not one "that resulted from any certain strain. Apparently chafed completely—hung on until just these last few strands let go at the time of the accident." He further testified that the use of the wire was very bad practice "because they are damaging the wire to begin with by the cutting edges." The witness Rodriguez said that it was an old wire, bent and a little rusty; while the witness Ross, who had been a seaman for 25 years, referred to it as a "rusty one" and "all rusted through" and stated that he had never seen a wire strap used to rig a guy line before. Rodriguez, who had had some sea experience prior to this voyage, in the steward's department and in the engine room (how much experience does not appear) never before had seen a strap used on a jumbo boom. He said the wire was old and a little rusty. Witness Rice, rigging expert called

by defendant, testified that the shackle was the safest instrument, and that in his opinion when the strain came the rigging broke at its "weakest link," the wire strap. Witness Gallagher, port captain for defendant, testified there were other shackles on board the ship which could and should have been used, and that it was not good seamanship to use the strap in lieu of a shackle. The breaking strain of a shackle, the device customarily used, would be 33.4 tons. A safe working strain under a factor of five, would be 6 or 7 tons. On the other hand, the breaking strain of a strap such as was used, *when new,* would be 14 tons. The manufacturers recommend a safety factor of five, so that a safe working strain would be 2.8 tons. The strap, which it was testified was in the same condition as at the time of the accident, was admitted in evidence and exhibited to the jury.

Thus, there is substantial evidence that the use of the strap was negligent, that the method was unusual and unsafe, and that the strap itself was not in good condition. Defendant contends that the fact that it did not give way in the strain of unloading heavy materials, shows that the strap was a safe appliance to use, and shows that the sole proximate cause of its breaking was not its condition or use, but the violent strain put on it by the winch operators, which fact could not have been foreseen. These were matters for the jury to determine.

While defendant contends that the strain on the equipment was abnormal, due to the negligence of the stevedores, the method used for securing the boom for the voyage placed considerable strain on the equipment. Witness Boyer stated that they were going "to secure it [the boom] by the outboard guys and the purchase" and that that would "be by taking a strain on both the outboard guys and also the purchase." Although there was evidence that the two winches were heaving in opposite directions at the same time, there was also evidence that the starboard winch controlling the port guy was stopped. The jury may have adopted the latter theory, although the other theory would not relieve defendant of responsibility for the accident. It is a reasonable inference from the evidence that the combination of the excessive strain and the weakness of the strap caused the accident. There is evidence in the record conflicting with the testimony above set forth as to the cause of the accident, but the determination of that conflict, of course, was a matter for the jury. If the jury could not reconcile that conflict, it was their province

"to affix their own value to the contradictory evidence." (*McKean* v. *Alliance Land Co.,* 200 Cal. 396, at p. 398 [253 P. 134].)

Many of the contentions made by defendant concerning its claim that the use and condition of the wire were not proximate causes, together with the negligence of the stevedores, of the accident were made and answered in the case of *Jackson* v. *Utica Light & Power Co.,* 64 Cal.App.2d 885 [149 P.2d 748]. In that case a power pole of the defendants' had broken, permitting defendants' high power wires to fall upon a farmer's telephone wire. Deceased, a power shovel operator on a near-by project, met his death when his power shovel came in contact with the telephone wire. Defendants contended that the breaking of their pole was not the proximate cause of the accident, but that the alleged contributory negligence of the deceased in causing his power shovel to come into contact with the farmer's telephone line was. The court, in discussing the matter of "proximate cause" said (p. 891): "The doctrine of 'proximate cause' or 'Causal relation necessary to the existence of liability' is one which has presented some difficulty in its application to cases grounded upon negligence in which an act of the plaintiff or another has intervened in such manner that the intervening act may be said to be immediate cause of the resulting injury. There are many authorities holding that the intervention of such act does not necessarily prevent the negligence of the defendant from being the proximate cause of the resulting injury. [Citing cases.] While the question of whether the negligence of a defendant may be held to be the proximate cause of the injury despite such intervening act is a question of law for the determination of the court [citing cases], the foregoing authorities clearly indicate the question of whether the negligence of a defendant should be held to be the proximate cause of the injury is ordinarily a question of fact for the determination of the jury. . . . In the Restatement of the Law of Torts, section 430 et seq., the necessary 'causal relation' is said to be determined on the basis of whether defendants' negligence was a 'substantial factor in bringing about the harm' (§ 431; see, also, § 433); and that 'If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable' (§ 435).

It is there said that if the question of whether defendants' negligence is a 'substantial factor' is 'open to a reasonable difference of opinion,' the question is one for the jury. (§ 434.) And even in this state where the test seems to be based generally upon foreseeability, it has been said that a defendant may be liable even though 'it might not have foreseen the particular injury which did happen' [citing cases] and that it is not necessary that defendant should have been able to anticipate the 'precise form of the consequential injury' [citing case] or the 'precise accident' [citing case]."

The principles discussed are applicable here. Although it may not have been foreseeable exactly what kind of accident would occur, it should have been foreseeable that some type of accident was likely if the starboard block was not fastened securely to the starboard king-post. All of the rigging is subject to great strain during the handling of cargo, and there are always seamen close by who might be hurt if the rigging gives way.

Plaintiff contends that defendant is liable for the acts of the winch operators on the ground that at the time of the accident admittedly they were not loading or unloading cargo, but were doing work for the ship, that is, helping get it shipshape to put out to sea. In view of our holding that one of the proximate causes of the accident was the defendant's negligence, we do not deem it necessary to discuss this question.

### Were the Damages Excessive as Matter of Law?

The flying block struck plaintiff on his left side near the bottom of the rib cage. When taken to a hospital in San Miguel, some 20 miles away, it was found that his spleen had been ruptured, and it was removed by an operation under general anesthetic. Plaintiff remained in San Miguel 38 days, during which time he developed pneumonia. The coughing caused his incision to reopen and it was necessary to resuture the incision. Plaintiff boarded a ship for San Francisco on February 27, 1947, but on March 1 was running a temperature and efforts were made to land him at Acajutla. This was not done, probably due to the weather, and he was taken 60 miles to San Jose de Guatemala, where he remained in a hospital for nine days. From there, plaintiff was flown to San Francisco in an ambulatory condition, and reported to the Marine Hospital in San Francisco as an outpatient. He reported there from time to time until August 2, 1947, at

which time he was examined and reported fit for duty. On October 4, 1947, herniation in the abdominal incision appeared, and, upon recommendation of the Marine Hospital, he was operated on for surgical repair on October 11. He remained in the Marine Hospital until November 6, and on December 8 the hospital found him no longer disabled. In March, 1948, plaintiff went to sea again, but was unable to carry out the more strenuous duties of a seaman, such as cargo handling, etc. Prior to this time, he had worked for two months in a cannery, in 1947.

Dr. Mitchell testified that he last saw plaintiff three weeks prior to the trial; that there was a slight amount of weakness in the scar resulting from his three operations; that there was a hernia condition present; that plaintiff probably had adhesions; that while plaintiff can get along without a spleen, he is definitely weakened in many respects; that plaintiff is required to wear a corset or belt because of weakness of the abdominal wall; that if plaintiff contracts a serious disease or another hernia, his chances of survival are less than those of a normal person. Plaintiff testified that he continually feels weak and that on the 20-day trip from which he returned just before the trial he could do only light work; he could not go up the mast or pull guys.

The jury awarded $30,000. The court reduced the amount to $23,500. To hold this award excessive we must determine that it is so large as to indicate passion or prejudice on the part of the jurors. (*Holmes* v. *Southern Cal. Edison Co.,* 78 Cal.App.2d 43 [177 P.2d 32]; *Buswell* v. *City & County of San Francisco,* 89 Cal.App.2d 123 [200 P.2d 115].) In the face of the loss of his spleen, the fact that "he had every kind of complication a fellow could have after a surgical operation," that he will never be able to perform the heavy work required of an able seaman which he had always performed before, and the other circumstances of his injury, we cannot say that the award is excessive as a matter of law. This, in spite of the fact that a doctor called by defendant testified, in effect, that in his opinion plaintiff was just as healthy as a person with a spleen.

Defendant contends that we must assume as matter of law that the reduction by the trial judge of the amount of the verdict is a finding that the verdict was the result of passion and prejudice, citing *Cooksey* v. *Atchison, Topeka etc. Ry. Co.,* 78 Cal.App.2d 504 [178 P.2d 69]. That case does not so hold.

There the trial judge did not modify the verdict. He refused to grant a new trial, one of the grounds of the motion being alleged excessiveness of the verdict. The court held that in view of that ground having been urged and the judge having refused to order a new trial (p. 508), "His ruling, in denying the motion, 'is persuasive in determining whether the verdict was based upon passion or prejudice.' (*Foster* v. *Pestana,* 77 Cal.App.2d 885, 890 [177 P.2d 54].)'' There is nothing in the opinion to support defendant's contention that because of the holding there, the converse would be true, namely, that a reduction of damages by the judge would be a determination that the verdict was based upon prejudice and passion. Even if the action of the judge in reducing the award could be so considered, it would not follow that the amount to which the verdict was finally reduced was one awarded through the passion and prejudice of both the jury and the judge. The opinion shows that the court on such a motion is acting as a "thirteenth juror." (P. 509.) In *Holder* v. *Key System,* 88 Cal.App.2d 925 [200 P.2d 98], this court in discussing the difference in the powers of the trial judge and an appellate court in reviewing the amount of the verdict said (p. 962): "The proper rule is set forth in *Holmes* v. *Southern Cal. Edison Co.,* 78 Cal.App.2d 43, 51 [177 P.2d 32], in the following language: 'The powers and duties of a trial judge in ruling on a motion for new trial and of an appellate court on an appeal from a judgment are very different when the question of an excessive award of damages arises. The trial judge sits as a thirteenth juror with the power to weigh the evidence and judge the credibility of the witnesses. If he believes the damages awarded by the jury to be excessive and the question is presented it becomes his duty to reduce them. [Citing cases.] When the question is raised his denial of a motion for new trial is an indication that he approves the amount of the award. An appellate court has no such powers. It cannot weigh the evidence and pass on the credibility of the witnesses as a juror does. To hold an award excessive it must be so large as to indicate passion or prejudice on the part of the jurors.' The question is not what this court would have awarded as the trier of the fact, but whether this court can say that the award is so high as to suggest passion or prejudice." (See, also, *Tyson* v. *Romey,* 88 Cal.App.2d 752 [199 P.2d 721].) ". . . it is not to be assumed from the making of such conditional order that the trial court concluded that the verdict was the product of passion or prejudice." (*Standi-*

*ford* v. *Cantrell*, 87 Cal.App. 736, 743 [262 P. 800] ; to the same effect, *Hughes* v. *Hearst Publications, Inc.*, 79 Cal. App.2d 703 [180 P.2d 419] ; *Swett* v. *Gray*, 141 Cal. 63 [74 P. 439].)

The appeal from the order denying the motion for a new trial is dismissed; the judgment is affirmed.

Peters, P. J., and Ward, J., concurred.