[Civ. No. 5377.   Fourth Dist.   Apr. 11, 1957.]

DANIEL F. SAFINA, Respondent, v. SAFEWAY STORES, INC. (a Corporation), Appellant.

Ray W. Hays and James N. Hays for Appellant.

C. Ray Robinson, Robert T. McCartney and Charles E. Sells for Respondent.

BARNARD, P. J.—This is an action for damages for injuries suffered by this plaintiff when he fell in a store operated by the defendant. A jury awarded him $25,000, the court denied a motion for a new trial, and the defendant has appealed from the judgment.

In 1945, the plaintiff sustained a severe injury to his left hip joint in an automobile accident near Long Beach. He was then in a hospital for about six months, and he walked on crutches a large part of the time until 1948. It appears, without dispute, that a large part of the acetabulum or socket bone of the hip was broken off in that accident; that thereafter the end of the femur, instead of resting in the proper socket, came to rest in a different position against a "shelf" which nature built up, and that about 1947 or 1948 the left hip joint thus formed had become fused or ankylosed, forming a stiff or nearly stiff joint. As a result his left leg was about 3 inches shorter than his right, and he wore a 3-inch heel on his left shoe. After 1948, he walked with a cane but did not use crutches except for a short period in 1951 following another automobile accident in San Francisco.

He learned watch repairing and from 1949 or 1950 until October 4, 1955, he operated a watch repair shop in Fresno. During that period his yearly income averaged from $2,000 to $3,000. While in the shop he occasionally took a step or two without the cane, with the cane hanging in his hip pocket. While he had walked with a cane and with a considerable limp for years, he was without pain and was able to carry on most of the activities of a normal person. He went fishing and hunting and swimming, and played croquet and pool. He drove a car and could go up and down stairs. He mowed his lawn with a power mower, milked and took care of some goats, and polished his own shoes.

On October 4, 1955, the plaintiff drove his car to this Safeway store and went in to do some shopping. He was unable to find what he wanted and decided to buy some gum, which he knew was at some place near the front of the store. While he was walking along an aisle, looking at various goods which were displayed for sale, he bumped into an empty carton on the floor and fell. He felt immediate pain and heard a snapping noise in his hip. He was unable to rise and remained on the floor until he was taken to a hospital in an ambulance.

There was evidence that this carton was of the type that canned goods usually are shipped in, and that it was 2½ feet long, 2 feet wide and 2 feet deep. It was cut open smoothly at

the top indicating that canned goods had been removed from it, after which it had been left in the aisle. It was the custom in this store to move such empty boxes to the front of the store near the check stand for use in packing groceries for customers. Two clerks who were then checking stated that they checked only occasionally during busy hours, and that they had seen boxes on the floor at times shortly before the plaintiff fell. There were numerous displays in the store at the time, which were made by stacking boxes of canned goods on top of one another with a sign on them at eye level reading "Specials."

The plaintiff was taken to the Community Hospital where he was treated by his own doctor, who administered narcotics to ease the pain. The next day he was taken to the Veterans' Hospital in Fresno, where he spent a total of 70 days prior to the trial. From the time of the fall to the time of the trial in April, 1956, he was unable to bear his weight on this leg and was on crutches during all times when he was not confined to the hospital. During this period he did no work at his place of business and was able to earn only about $40 by doing some minor repair jobs at his home.

Three hospital records were introduced in evidence. The first referred to the previous injury at Long Beach, and stated that although surgery of the left acetabulum had been contemplated this surgery was never done and plaintiff was allowed to ambulate with his left leg three inches shorter than the right; that the X-ray revealed that the relationship of the bones in the left hip joint was the same as it was in 1951, at which time the patient was hospitalized for another purpose; that the head of the femur is not dislocated from the hip joint any more than it was before, but is not in the original hip joint and appears to be in a reconstructed one formed by a shelf above the acetabulum; that it was agreed by all of the staff that there was no change in the bony relationship from two years ago, when he was admitted for another purpose; that the diagnosis was "Strain of left hip joint, treated, improved" and that there was some traumatic arthritis which was untreated and unchanged; that he was ambulating satisfactorily on crutches; and that on October 13 he was given a two-weeks' leave of absence. The second record states that he was readmitted to the orthopedic service on October 31; that he was prepared for insertion of a prosthesis in his left hip, "for his traumatic arthritis, secondary to fracture of the left acetabulum, old"; and that because of the patient's anxiety over the surgery the surgery was cancelled and he was given a

leave of absence from November 9 to December 1. The third record states that the patient was again admitted on December 5; that on December 12 the X-ray of the hip was explained to the patient and because of his difficulty and pain in the hip he then consented to have an exploration made for correction of the dislocation, and for the insertion of the prosthesis "if indicated"; that on December 14 an operation was performed and the prosthesis was inserted; that on January 15, 1956, the range of abduction and the range of flexion of the hip were markedly improved, but the patient was not yet able to lift the leg off the bed with his own power; that on January 23, it was found that the new metal head which had been put on the femur had dislocated and the patient was informed that it would be necessary to correct this under anaesthesia; that the patient stated that he had some very important business to attend to and requested a two-weeks' leave of absence; and that the leave of absence was granted "because a decision has to be made as to whether or not a closed reduction would be necessary or an open reduction."

Four doctors testified, two being called by the plaintiff and two by the defendant. The plaintiff's family doctor was asked whether he had a medical opinion to a reasonable certainty as to what happened to this joint at the time of the fall. He replied, "Yes, I feel that this man had an ankylosed joint which was stiffened and fused prior to the fall; that as a result of his fall that joint was torn loose, and that the hip bone was then dislocated posteriorly." The chief orthopedic surgeon at the Veterans' Hospital testified that after the fall the fusion was broken; that they performed the operation for the insertion of the prosthesis to cure the old fractured acetabulum; that a prosthesis is an artificial metal head which is substituted for the bone head of the femur; that you could see that this patient's ankylosis had been broken or destroyed at the time of the fall; that this patient had not yet been discharged from the hospital and that he will require further treatment; that it was discovered in January that the artificial head which had been inserted in December had dislocated and would have to be fixed so that it could not redislocate; that there were two things that could be done; that one way was to re-fuse the bone, which would take from six months to a year; that the other way was to give him an artificial head on the femur, which is what they decided to do here; that in this way they could make him ambulatory so he could walk around with a stable hip in about three months; that after that there would

be a period of rehabilitation to enable the patient to learn to use muscles which had been atrophied; that these muscles would have to be developed so they could do the work they were supposed to do; that this "will take an intelligent handling" and an excellent cooperation from the patient; that after that he would be able to resume his occupation and do such things as walking and climbing stairs; that the atrophy of the muscles had occurred between 1945 and 1955 and not after this fall; that the operation which he proposed would give the patient a movable hip instead of a fixed hip, and three months after they operated he would have a better hip than he had before; that he could not say how long a period of rehabilitation would be necessary; that while the hip was fused before it had not fused in the proper joint, but the femur had attached itself to a shelf formed above the regular socket; and that the relationship of the hip bones is as it was in 1951. A doctor for the defendant testified that the ball end of the femur was completely out of the socket in 1947, there was a dislocation of the hip joint and a large piece had broken out of the socket bone; that the fall did not cause any disturbance of the bony situation in that hip; that the patient had had a strain which had caused pain because of an arthritic condition there; that except for arthritis the condition was the same now as it was in 1947 and 1948; and that he had recommended surgery in 1947 and would have recommended it after October 4, 1955. Another doctor for the defendant testified that the X-rays taken in 1955 showed the same situation with respect to the bones as those taken in 1951. In effect, the testimony of the doctors was that the bones had fused after the accident in 1945 although not in the proper position, that this fusion was broken by the fall in defendant's store, and that the position and relationship of the bones was the same after the fall as it was before. One doctor thought that the plaintiff's present condition could be relieved or cured by another operation, the primary purpose of which would be to correct the situation which had existed for many years, with the result that the patient would have a better hip than he had before this fall. If any of the other doctors had an opinion as to the possibility of restoring the plaintiff to as good a condition as before the fall, or how long this would take, it was not brought out in their testimony.

The appellant contends that the evidence is insufficient to support the judgment. It is argued that there was no evidence of negligence on its part since its two clerks, who testified, did not remember seeing any empty box in that area, and

since no unreasonable risk was to be anticipated because it would have no reason to believe that customers would fail to see the box or realize any risk involved. It is also argued that it conclusively appears that the respondent was guilty of contributory negligence in failing to see a box of this size, and since he testified that he was walking along looking at the displays and without paying any attention to whether or not there were boxes in the aisle. Whether or not the appellant was guilty of negligence was a question of fact, under the evidence. It might well have been found as a factual matter, especially in view of his handicapped condition, that the respondent was guilty of contributory negligence in allowing himself to stumble over a box of that size. However, this issue was also one of fact and it cannot be held as a matter of law that he was guilty of contributory negligence.

The main point raised on this appeal is that the amount allowed to the respondent is excessive. It is argued that the respondent suffered only a strain, that nothing was broken or torn loose, and everything remained in exactly the same place as before the fall; that the hospital reports and one of the doctors agreed that respondent's condition was unchanged except for a strain and the pain caused by an arthritic condition; that most of the special damages were the result of the respondent's delay in having the condition repaired, and the existence of a prior condition which was sought to be corrected; and that there was evidence that as a result of another operation the respondent would have a better hip than he had before.

What is adequate compensation in such a case as this is a question of fact, and as said in *Kircher* v. *Atchison, T. & S. F. Ry. Co.*, 32 Cal.2d 176 [195 P.2d 427] : "[i]t is well settled that even though the award may seem large to a reviewing court, it will not interfere unless the allowance is so grossly disproportionate to a sum reasonably warranted by the facts as to shock the sense of justice and raise a presumption that it was the result of passion and prejudice."

While the respondent was badly handicapped as a result of the accident in 1945, it clearly appeared that his hip joint had become sufficiently fused to enable him to carry on normal activities without pain for a number of years. It also clearly appears that his condition was seriously and adversely affected by the fall, that this fusion was broken or damaged by the fall to the extent that he could not thereafter carry on his normal activities, that he continued to suffer

pain, and that he could walk only by the use of crutches. One doctor testified that he could have carried on his former activities for the rest of his life in the absence of the Safeway injury, and that he would have to favor that hip the rest of his life. There was evidence that his hospital expenses were about $2000 up to the time of the trial, that further hospitalization and another operation at least would be required, and the future expense in that connection was problematical. He had lost about six months' income at the time of the trial and from the evidence it would appear that a considerable loss of income would thereafter occur. He had already been in the hospital for 70 days, and at the best would require considerable further hospitalization and an indefinite amount of time to complete such recovery as was possible. He had suffered complete disability up to the time of the trial and the evidence indicates that he would, without doubt, suffer total disability for a considerable time in the future. It had taken about three years, after 1945, for his bones to fuse to an extent enabling him to walk without crutches and without pain, and it was problematical as to whether or not he would ever be in as good condition as he was before this fall, or if so how long it would take. While one doctor expressed the opinion that with another operation he could be given a better hip than he had before, it was glaringly apparent that the same sort of operation had already been performed by this same doctor without success, and with the patient still practically helpless four months later. All of these factors, together with the patient's pain and suffering and present condition six months after the accident, and including the present cost of living and decreased value of the dollar, were elements which the jury were entitled to take into consideration. While good arguments may be made to the contrary, as the appellant has done, it cannot be said that there was no substantial evidence to support the amount of the award. While the evidence as to the extent of future disability, and the time it would last, is not too satisfactory, the evidence indicated that these elements were not inconsiderable. The question as to the amount of damages was primarily a factual matter for the jury, which could believe one part of the evidence and reject other portions, and the weight of the evidence was again reviewed by the trial judge on a motion for a new trial.

So far as can be gleaned from the written record, we feel that we would have held the amount of damages to be ex-

cessive had we been passing on the motion for a new trial.

However, the rules governing a trial judge on ruling on such a motion and those governing an appellate court on an appeal from a judgment are very different, and an appellate court cannot weigh the evidence beyond the point of ascertaining whether or not there is any substantial evidence to support the verdict. (*Holmes* v. *Southern Calif. Edison Co.*, 78 Cal.App.2d 43 [177 P.2d 32] ; *Bazzoli* v. *Nance's Sanitarium, Inc.*, 109 Cal.App.2d 232 [240 P.2d 672].) It may be said here as was said in *Johnston* v. *Long*, 30 Cal.2d 54 [181 P.2d 645] :

"The verdict is undoubtedly high. Nevertheless, it is not the function of a reviewing court to interfere with a jury's award of damages unless it is so grossly disproportionate to any reasonable limit of compensation warranted by the facts that it shocks the court's sense of justice and raises a presumption that it was the result of passion and prejudice. (*Zibbell* v. *Southern Pacific Co.*, 160 Cal. 237, 255 [116 P. 513].) The amount of the verdict must be viewed in the light of the evidence before the trial court. (*Zibbell* v. *Southern Pacific Co., supra*, at 254.) The trial court, in denying a motion for new trial, found that the verdict was not excessive. This decision lends weight to the jury's award. (*Bisinger* v. *Sacramento Lodge No. 6*, 187 Cal. 578, 585 [203 P. 768] ; *McSweeney* v. *East Bay Transit Co.*, 60 Cal.App.2d 807, 814 [141 P.2d 787].)"

It is further contended that the court erroneously instructed the jury that it is the duty of the owners of a grocery store to keep the store and passageways reasonably safe for business visitors, and in further instructing the jury that, in the absence of contributory negligence, the owner of a grocery store is liable for injuries to a business visitor which is proximately caused by any unsafe condition in the store and its passageways if the owner or its employees knew of such condition, or if they could have discovered such condition by the use of reasonable care. It is argued that the first of these instructions omitted the requirement that the owner must exercise reasonable care in keeping the premises reasonably safe, and that the second instruction referred to "any unsafe condition" whereas the duty owed to the business visitor is to keep the premises in a "reasonably safe condition." It cannot be held that these instructions in any way misled the jury, and in five other instructions the jury was told that the duty of a store keeper is to exercise reasonable and ordi-

nary care to keep the aisles and passageways in the store in a reasonably safe condition, and in a condition reasonably safe for the invitee.

Under established rules, we feel compelled to hold that there was sufficient evidence to sustain the verdict and that no reversible error appears.

The judgment is affirmed.

Griffin, J., and Mussell, J., concurred.