[Civ. No. 13837. First Dist., Div. One. Dec. 2, 1948.]

NORA E. HOLDER et al., Respondents, v. KEY SYSTEM (a Corporation) et al., Appellants.

928

Donahue, Richards, Rowell & Gallagher for Appellants.

Johnson, Ricksen & Johnson for Respondents.

PETERS, P. J.—The widow, adult son and adult daughter of John Holder brought this action against the Key System and one of its motormen to recover damages for the claimed wrongful death of John Holder. The jury, unanimously, brought in a verdict of $45,000, and judgment was entered accordingly. Defendants appeal urging: (1) Insufficiency of the evidence to support the judgment; (2) erroneous and prejudicial rulings on admissibility of evidence; (3) misconduct on the part of plaintiffs' counsel; (4) misdirection of the jury; and (5) that the verdict is excessive as a matter of law.

Holder was killed in a collision between the automobile he was driving north on Grove Street in Oakland, and an interurban Key System electric train going west on 40th Street. The accident occurred about 4 o'clock in the afternoon of June 11, 1946, which was a clear, dry day. The complaint charged that the collision was proximately caused by the negligence of defendants. The answer of defendants denied that they were negligent and charged contributory negligence on the part of Holder.

At each corner of the intersection of Grove and 40th Streets is an electrically operated traffic control device with the customary warning bells, and with red, green, and amber lights. Electric signal activators on the Key System tracks, and elec-

tric control boxes on poles on 40th Street about 400 feet east and west of the intersection are connected with the traffic control devices so that the interurban trains may cross the intersection without stopping, that is, when the front truck of the train passes over the signal activator the signal lights for Grove Street traffic immediately become red, or remain red if they are already that color, and continue so until the train has passed the intersection.

On the day in question, as decedent, who was driving north on Grove Street, approached the intersection with 40th Street, the traffic lights turned red for north and south traffic, and he stopped his Plymouth coupé near the east curb, a few feet south of the intersection. A Ford automobile was to his left, and also stopped.

It is urged by appellants that the evidence shows that decedent then drove forward against the red traffic signals and was hit by the train. Appellants admit, however, that the witness Young testified to the contrary. This witness operated a gasoline service station on the southeast corner of the intersection. He testified that just prior to, and at the time of, the accident he was standing in front of his place of business; that his attention was called to the Plymouth driven by decedent because it looked like one owned by one of his customers, and for that reason when it stopped he paid particular attention to it; that the red signals turned to green for north and south traffic and the Ford and Plymouth started to cross the intersection; that the Ford proceeded across the intersection; that the lights were green for a "couple" of seconds; that the Plymouth started forward slowly and the hood up to windshield was past the south curb line when the lights turned red warning of the oncoming train; that at that time the train was about 300 feet east of the intersection and was moving west. One of appellants' witnesses was quite clear that the Plymouth proceeded into the intersection against the red lights. Other witnesses testified that when they observed the Plymouth in the intersection the north and south traffic lights were red, but they could not testify that the lights were red when the Plymouth entered the intersection. It is obvious, therefore, that, insofar as the appellants contend that the decedent was guilty of contributory negligence, as a matter of law, in entering the intersection against the red lights, they are foreclosed by the record. There is substantial evidentiary support for the implied finding of the jury that the lights were

green when decedent entered the intersection, and that finding is therefore binding on this court.

Appellants next contend that, even if decedent entered the intersection when the lights were green in his favor, he was guilty of contributory negligence, as a matter of law, in that he failed to look and see the train coming from the east. Young testified that when the lights turned from red to green he observed the train approaching at 35 to 40 miles per hour. It is urged that, if Young saw the approaching peril, the same view was open to decedent, and that a reasonable man exercising reasonable care would have stopped his automobile before reaching the tracks. We cannot agree with the contention that at this intersection failure to observe the oncoming train and failure to take steps to avoid the collision constituted contributory negligence as a matter of law. This was a controlled intersection. Decedent, under the evidence most favorable to respondents, entered the intersection with the green lights inviting him on. A pedestrian or a driver of a vehicle entering an intersection with the green lights in his favor is entitled to assume that the cross traffic, whether it be automobile or train traffic, will observe his right of way. Whether the person entering the intersection, under such circumstances, should have observed that a train in cross traffic was approaching at such an excessive rate of speed that it could not stop, was for the jury to decide, and its finding on this issue is conclusive. The proper rule is stated as follows in *Kirk* v. *Los Angeles Ry. Corp.*, 26 Cal.2d 833, 838 [161 P.2d 673, 164 A.L.R. 1] : ''Plaintiff was justified in leaving the east curb of Broadway inasmuch as the traffic signal was in her favor. Whether or not she should have observed that the streetcar had started forward at that time, and if it had, whether she was aware of the danger, were for the jury to decide. Moreover, a pedestrian while he is bound to exercise due care when crossing at an intersection in the crosswalk with the traffic signal in his favor, yet he has the right of way and may assume that the traffic signal will not be violated by traffic crossing his path, and the issue of his negligence is for the jury. [Citing cases.] When a pedestrian is in or about the middle of the street he is crossing, and the traffic signal changes against him, he may assume that due care will be exercised by the released cross traffic as to pedestrians so trapped. Whether a mistake in judgment by a pedestrian when crossing a street, as to the speed and danger of an approaching vehicle constitutes contributory negligence, is a question for the jury.

[Citing cases.]'' While this case dealt with a pedestrian trapped in the intersection by a change in the signals, and also dealt with a streetcar that was proceeding at right angles to the pedestrian, no different rule, logically or legally, can apply to the driver of a vehicle trapped in the intersection, or to an interurban train traveling on a public street that violates the right of way of the driver of the vehicle. Under the circumstances here it was for the jury to say whether decedent acted as a reasonable man under the circumstances.

Appellants urge that certain rulings on admissibility of evidence were prejudicially erroneous. Respondents produced from the official files of the Public Utilities Commission, and introduced into evidence, a certified copy of a resolution of the commission dated August 24, 1936, granting the Key System permission to connect track circuits with the traffic control system at the intersection of 40th and Grove Streets. This resolution was in general terms and contained no express conditions. But respondents also produced from the same source, and introduced, certain correspondence between the commission and the Key System, and also introduced certain correspondence between the city of Oakland and the Key System, all of which tended to supplement and explain the resolution. Appellants objected to the admissibility of this supplementary material. It is their contention that the effect of the commission's order must be determined by the terms of the order and that such a formal order cannot be modified, supplemented or explained by such letters.

Interurban electric railroads such as the Key System are under the jurisdiction of the commission, and the commission has exclusive control and supervision over their operation. (*Los Angeles Ry. Corp.* v. *Los Angeles*, 16 Cal.2d 779 [108 P.2d 430]; Public Utilities Act, Stats. 1915, p. 115; 2 Deering's Gen. Laws, Act 6386.) Section 42 of that act reads as follows: "Safety devices. The commission shall have power, after a hearing had upon its own motion or upon complaint, *by general or special orders, rules or regulations, or otherwise,* to require every public utility to construct, maintain and operate its line, plant, system, equipment, apparatus, tracks and premises in such manner as to promote and safeguard the health and safety of its employees, passengers, customers, and the public, and to this end to prescribe, among other things, the installation, use, maintenance and operation of appropriate safety or other devices or appliances, including interlocking and other protective devices at grade crossings or junctions

and block or other systems of signaling, to establish uniform or other standards of construction and equipment, *and to require the performance of any other act which the* health or *safety of* its employees, passengers, customers or the *public* may demand." (Italics added.)

 It is thus quite apparent that the commission may require a public utility to act in a certain manner not only by formal orders, but by regulations or rules. It is also apparent that, in the ordinary course of regulation, before an order is adopted, there frequently will be correspondence between the utility and the technical staff of the commission discussing the conditions upon which the requested permission will be granted. It is also quite apparent that, when the technical staff fixes the conditions and the commission thereafter grants the requested permission by general order, the order necessarily includes the conditions. That is exactly what happened here. The utility requested permission to construct its control system at this intersection so that its trains would not have to stop on the east side of Grove Street (the station was on the west side) if the traffic lights were red. Correspondence resulted between the company, the city of Oakland and the technical staff of the commission. Finally, Warren K. Brown, director of transportation for the commission, wrote to H. P. Bell, vice president of the Key System, setting forth eight conditions upon which the commission would approve the requested installation. The first two conditions set forth in that letter are particularly pertinent here. The pertinent portion of the letter reads as follows: "This will acknowledge receipt of your letter of August 7, 1936, along with which you submitted to the Commission three copies of your drawing number 84-014, dated July 24, 1936, showing plans for traffic signals at the intersection of Grove and 40th Streets and the tracks of your 40th Street interurban line for the control of vehicles and trains crossing No. 7D-4.47. These plans meet with the Commission's approval, subject, however, to the following conditions; 1. Track circuits shall be approximately 400 feet in length on both sides of the crossing. 2. Trains shall cross over Grove Street at a speed not in excess of 10 miles per hour."

That the Key System knew that the approval of the commission was subject to these conditions was demonstrated by a letter written by Bell to the superintendent of the electrical department of the city of Oakland. It reads in part as follows:

"With reference to installation of traffic signals at the intersection of 40th and Grove Streets, I am enclosing to you herewith our circuit print, 84-014, showing approval of the City of Oakland, Key System and California Railroad Commission. *You will note that the last approval of the above named has been given 'in accordance with conditions specified in letter dated August 24, 1936, file 183-1.'* I note that copy of the letter above referred to was marked for your attention, but I am attaching another copy hereto for your quick reference.

"Will you kindly advise me if you take exception to any of the eight conditions prescribed by the Railroad Commission?" (Italics added.)

■ These were all official records of the commission and, as such, admissible. (Code Civ. Proc., §§ 1953e-1953h.) The documents disclose that the imposition of the conditions was a part of the permission granted by the commission in the exercise of its official power to regulate utilities, and the correspondence demonstrates that the Key System knew that this was so before the installation was made. The form in which the conditions are made, under the statute, is immaterial.

Appellants contend, however, that it was error to introduce the letter of Brown containing the speed regulation because, to use their words, "the formal order or resolution of August 24, 1936, imposed no speed limit. Therefore, the evidence admitted did not show a binding agreement obligating interurban trains, from then on, to observe an inflexible speed limit in crossing in the intersection. The most the evidence showed was a 'gentleman's agreement' or statement of policy for the time being." (App. Op. Br. p. 16.) The position is untenable. ■ The regulation of public utilities by the commission is not a matter of contract between the utility and the commission. The conditions imposed by the commission constituted regulations by the commission and were binding on the utility.

■ That the two conditions were relevant to the issues involved is obvious. One of the basic issues was whether the train was operated in a negligent manner. One of the negligent acts proved was excessive speed. The automobile was pushed by the train 189 feet from the point of impact. The motorman admitted that he was traveling 20 to 25 miles an hour as he approached the intersection, and claimed a speed of 15 to 20 miles an hour at the point of impact. He testified that he slammed on full emergency brakes 50 feet before reach-

ing the intersection. Young testified that the train approached the intersection at a speed of between 35 to 40 miles per hour. Other testimony fixed the rate of speed of the train from 15 to 25 miles per hour. All the evidence was to the effect that the train was going over 10 miles per hour at the point of impact. The expert witness called by appellants admitted that, had the train been proceeding at 10 miles per hour, it could have been stopped in 50 feet. Obviously, a violation of the speed regulation fixed by the commission for this very intersection, was relevant on the issue of negligence. (*Brumhall* v. *Sutherland,* 110 Cal.App. 10 [293 P. 672; *Siemers* v. *Eisen,* 54 Cal. 418; *Wright* v. *Los Angeles Ry. Corp.,* 14 Cal.2d 168 [93 P.2d 135] ; *Jolley* v. *Clemens,* 28 Cal.App.2d 55 [82 P.2d 51] ; *Satterlee* v. *Orange Glenn School Dist.,* 29 Cal.2d 581 [177 P.2d 279].)

Appellants also contend that it was error to fail to strike certain operating rules and regulations claimed to be applicable to the Key System, and in admitting certain rules and regulations applicable to the Key System, but claimed not to be applicable to controlled intersections. Of course, applicable rules and regulations of a company are admissible on the issue of negligence, and appellants make no contention to the contrary. (*Gett* v. *Pacific G. & E. Co.,* 192 Cal. 621 [221 P. 376] ; *Simon* v. *City & County of San Francisco,* 79 Cal.App.2d 590 [180 P.2d 393].) The record shows that, while the motorman was testifying under section 2055 of the Code of Civil Procedure, counsel for respondents exhibited to him certain rules and regulations of the East Bay Transit Company, predecessor in interest of the Key System. These rules were dated 1940. The motorman testified, in response to a direct question, that it was the rules therein contained that he was operating under at the time of the accident. At that time counsel for appellants objected on the grounds that there was no proof that the rules were in effect at the time of the accident, nor that the challenged rules applied to the particular intersection. After a recess the witness was examined by his own counsel and then testified that the three rules in question were not applicable to him in 1946, and that he had been confused when he had testified earlier that they were applicable. Appellants' counsel stated that he had overlooked the fact that the rule book in question was that of a predecessor of the Key System. The superintendent of the Key System testified that the rules in question did not apply to interurban electric trains. Appellants' counsel moved to strike the three rules from the record. The trial court denied the

motion on the ground that the motorman had testified that he was subject to the rules, and that this presented a question of fact.

The correctness of the ruling is debatable. The witness seemed to be familiar with the rules, and stated that they were applicable at the time and place of the accident. Then he changed his story and testified that they were not then in effect. It can be argued that the credibility of his retraction was for the jury. But even if it were error not to have stricken the rules, such error was not prejudicial. The evidence demonstrates, without conflict, that the motorman was violating the speed regulation of the Public Utilities Commission. This was proved by even the testimony of appellants. The three challenged rules were quite general in character and their introduction into evidence, even if erroneous, could therefore not have been prejudicial.

Later in the trial the rule book of the Key System applicable at the time of the accident was produced, and several of these rules were read into evidence. One rule required speed of electric trains to be reduced to eight miles per hour "over railroad crossings, cross-overs, and junctions." Appellants contended that the rule was not applicable to a crossing of a streetcar track with an electric train track. This rule and several other general ones were admitted. But, even if erroneously admitted, these rules could not have prejudiced appellants. As already pointed out, the commission rule of 10 miles per hour was applicable and admittedly was violated. The fact that the jury may have erroneously thought another rule was violated as well does not detract from the admitted fact that the commission rule was violated.

It is next urged that the counsel for respondents was guilty of prejudicial misconduct in two respects: First, it is contended that counsel should not have referred to the fact that the Key System once maintained "wig-wag" signals at the intersection. This reference occurred at the time the parties were debating the admissibility of the letter of Brown to the Key System. During this argument the following occurred:

Counsel for respondents: "Well, your Honor, apparently the conditions set forth in the letter were accepted by both the City of Oakland and the Key System and they have been operating under those conditions since that period of time. And I certainly think that we are entitled to show what the conditions were under which the Railroad Commission per-

mitted them to take away their former wig-wags there and put in the electric——

"Mr. Gallagher: If the Court please, I am going to assign that as prejudicial misconduct, referring back to the wig-wag. I move at this time for a mis-trial.

"The Court: Motion is denied." (R. T. p. 70.) It is difficult to follow appellants' argument that this reference to "wig-wags" was misconduct. The reference was made in a natural and logical manner in connection with argument over the admissibility of certain evidence. Moreover, even if it were misconduct, it could not have been prejudicial. It is not reasonably probable that a reference to the fact that the commission consented to the replacement of wig-wags by signal activators could prejudice the jury in favor of respondents. The natural interpretation of such reference would be that the Key System was replacing the wig-wags with a more efficient device. ▉▉ It also will be noted that counsel for appellants did not request an instruction that the jury should disregard the challenged remark. On that ground alone he is barred from raising the question on appeal, except in most unusual cases of which this is not one. (*Olsen* v. *Standard Oil Co.*, 188 Cal. 20 [204 P. 393]; *Kershaw* v. *Tilbury*, 214 Cal. 679 [8 P.2d 109].)

▉▉ The second charge of misconduct centers on the fact that Brooks Holder, one of the respondents, being the son of decedent, testified that he intended to give his mother whatever damages he might recover. The record disclosed the following: "Mr. Ricksen: Q. One other thing. You are plaintiff in this action. You told me that whatever you recovered you wanted waived in favor of your mother? A. That is true. Mr. Gallagher: I am going to assign that as prejudicial misconduct and make a motion for a mis-trial. Mr. Ricksen: So it is in the record, Judge, if there is any division to be made on this, I think it is proper to do it here. The Court: The jury will disregard the question and the answer. The question and answer are stricken and you are instructed to disregard both. Mr. Gallagher: I make a motion for a mis-trial. The Court: Motion denied." (R.T. p. 88.)

While we think this question and answer were not admissible and were properly stricken from the record, their production cannot be held to have been prejudicial misconduct. The trial judge promptly instructed the jury to disregard the remarks. That normally cures the situation. (See *Tingley* v. *Times-Mirror Co.*, 151 Cal. 1 [89 P. 1097].)

Complaint is made of the refusal to give two instructions requested by appellants. These instructions read as follows:

"The electric train tracks of the defendant Key System Transit Lines were themselves a warning to Mr. John Holder that it was not safe for his automobile to be driven upon them or near enough to them to be struck by an approaching electric train without the exercise of constant vigilance to ascertain whether or not an electric train was coming, and Mr. John Holder's failure to exercise such vigilance would be negligence upon his part." (R.T. p. 282.)

"You are instructed that where the intersection movement of traffic is governed by signalling devices, as is true in this case, the determination of the question as to whether the one driver or the other is responsible for a collision at the intersection depends primarily upon the showing as to whether one vehicle or the other was being operated in conformity with the signal. The driver proceeding pursuant to the 'Go' signal is not to be deemed negligent because he fails to keep a lookout for a vehicle which might enter the intersection in violation of the signal." (R.T. p. 281.)

The first instruction was properly denied for several reasons. In the first place, it is not the law that the tracks of an electric train are a warning that "it was not safe for his [Mr. Holder's] automobile to be driven upon them or near enough to them to be struck by an approaching electric train without the exercise of constant vigilance to ascertain whether or not an electric train was coming." The case relied upon by appellants—*Docherty* v. *Key System,* 80 Cal. App.2d 888 [184 P.2d 33]—established no such rule. That case involved a crossing where the Key System's tracks are on a private right of way. In that case both sides agreed that, at the site of the accident, the rules relative to railroad intersections applied. But all we then held, even in such a case, was that, upon observing the tracks on the private right of way, Docherty "was under a special duty of care." (P. 893.) The court did not hold that the existence of the tracks required a driver of a car to exercise "constant vigilance to ascertain whether or not an electric train was coming." We know of no case laying down such a stringent rule, even in a private right of way case. Here it is admitted that both Grove and 40th Streets are public streets and highways.

The court instructed that a motorist must be "ever alert and watchful so as to not place himself in danger, and while he may assume that others will exercise due care, he

cannot for that reason omit any of the care which the law demands of him." This was a sufficient statement of the degree of care required of the decedent. The degree of care required, under the circumstances here involved, has been discussed earlier in this opinion.

 Error was not committed in failing to give the second requested instruction. The subject matter there involved was adequately covered by other instructions. The court quoted sections 475 and 476 of the Vehicle Code, requiring drivers of vehicles and motormen to obey traffic signals, and also instructed that: "I instruct you further that, irrespective of the condition of the automatic signal, both the driver of the automobile and the motorman of the train were still required to exercise ordinary care in meeting the situation as it existed at the time and place of the accident in question." That sufficiently covered the field. Respondents were contending, and apparently the jury believed, that decedent entered the intersection with the "Go" signals in his favor. The motorman knew that his train would change those signals in his favor about 400 feet from the intersection. He certainly should not be excused from keeping a lookout merely because he had changed the signals to green for himself when he knew, or should have known, that users of the street might be lawfully in the intersection when the signals were changed.

 The last contention of appellants is that the award of $45,000 is excessive as a matter of law. Decedent was 56 years of age at the time of his death. He then had a life expectancy of 16.7 years. He was earning $180 a month at the time of his death, but that job now pays $240 a month. His health was fair. The two respondent children are adults and were not dependent on their father. The respondent widow was dependent, and was 51 years of age when her husband was killed.

 It is well settled that before an appellate court can interfere with a judgment on the ground that it is excessive, the excess must either appear as a matter of law, or be such as to suggest, at first blush, passion, prejudice or corruption on the part of the trier of the fact. The proper rule is set forth in *Holmes* v. *Southern Cal. Edison Co.*, 78 Cal.App.2d 43, 51 [177 P.2d 32], in the following language: "The powers and duties of a trial judge in ruling on a motion for new trial and of an appellate court on an appeal from a judgment are very different when the question of an excessive award of damages arises. The trial judge sits as a thirteenth juror

with the power to weigh the evidence and judge the credibility of the witnesses. If he believes the damages awarded by the jury to be excessive and the question is presented it becomes his duty to reduce them. [Citing cases.] When the question is raised his denial of a motion for new trial is an indication that he approves the amount of the award. An appellate court has no such powers. It cannot weigh the evidence and pass on the credibility of the witnesses as a juror does. To hold an award excessive it must be so large as to indicate passion or prejudice on the part of the jurors." The question is not what this court would have awarded as the trier of the fact, but whether this court can say that the award is so high as to suggest passion or prejudice.

██ Another factor to be considered in cases involving damages for loss of a member of a family is that, although damages must be measured by the pecuniary loss to the plaintiffs, in fixing such loss the trier of the fact is not limited to proof of loss in dollars and cents, but may properly consider the pecuniary value of the loss of such noneconomic interests of a family as loss of comfort, society and protection. (*Bond* v. *United Railroads*, 159 Cal. 270 [113 P. 366, Ann. Cas. 1912C 50, 48 L.R.A. N.S. 687]; *Nason* v *Leth-Nissen*, 82 Cal.App.2d 70 [185 P.2d 880]; see, generally, *McGlothin* v. *Larussa*, 121 Cal.App. 758 [5 P.2d 611]; *Couch* v. *Pacific Gas & Elec. Co.*, 80 Cal.App.2d 857 [183 P.2d 91].)

██ Analysis of awards made in other similar cases, while of assistance, is by no means conclusive, particularly when the cited cases are not of recent origin "It is a matter of common knowledge, and of which judicial notice may be taken, that the purchasing power of the dollar has decreased to approximately one-half what it was prior to the present inflationary spiral [citing cases], and the trier of fact should take this factor into consideration in determining the amount of damages necessary to compensate an injured person for the loss sustained as the result of the injuries suffered." (*Kircher* v. *Atchison, T. & S. F. Ry. Co.*, 32 Cal.2d 176, 187 [195 P.2d 427]; in addition to the cases cited in the above opinion, see *Brown* v. *Boehm*, 78 Cal.App.2d 595 [178 P.2d 49].) Tested by these standards the case of *Jones* v. *Hedges*, 123 Cal.App. 742 [12 P.2d 111], does not compel a reversal. There the appellate court reduced a $40,000 award to $25,000 in a case where the decedent was earning $36 per week, had a life expectancy of 14.74 years, and left a widow with minor and adult children. But that case was decided in the depres-

sion year of 1932, and before the value of the dollar decreased.

Under these circumstances, and applying the rules of the above cases, there is nothing in the present record requiring or suggesting that the judgment is excessive as a matter of law.

The judgment appealed from is affirmed.

Ward, J., and Bray, J., concurred.

A petition for a rehearing was denied December 28, 1948, and appellants' petition for a hearing by the Supreme Court was denied January 27, 1949.