[Civ. No. 16421. First Dist., Div. One. Dec. 14, 1955.]

FLORENCE F. NEWTON et al., Respondents, v. J. BEN THOMAS et al., Appellants.

752

Campbell, Custer, Warburton & Britton, Frank L. Custer and W. R. Dunn for Appellants.

M. Mitchell Bourquin and William B. Boone for Respondents.

BRAY, J.—In action for damages for the death of George Newton, a jury awarded plaintiffs $50,000. Defendants appeal from the judgment entered thereon and from the order denying a motion for judgment notwithstanding the verdict.

### QUESTIONS PRESENTED

1. Was decedent guilty of contributory negligence as a matter of law? (a) Was the scene of the accident in a business district? (b) Did decedent violate any law?
2. Effect of including adult children in the award of damages.
3. Alleged error in giving and refusing instructions: (a) Failure to instruct that area was a business district. (b) Failure to instruct that violation of section 562, subdivision (a), Vehicle Code, would be negligence *per se*. (c) Giving an instruction that to be contributively negligent decedent must have lacked ordinary care. (d) Giving an instruction on justification for violating the ordinance. (e) Giving an instruction on imminent peril. (f) Giving an instruction on emergency created by defendants' own negligence. (g) Giving an instruction on intoxication. (h) Giving an instruction on headlight requirements. (i) Refusal to instruct that the 35-mile limit sign was immaterial. (j) Refusal to give other instructions.
4. Alleged errors: (a) Admission of accident report of Miss Newton. (b) Effect of jury taking into the jury room a report not admitted as an exhibit.
5. Are damages excessive?

### EVIDENCE

Decedent, his wife, plaintiff Florence F., his adult daughter, plaintiff Florence M., and one Stanley were returning to San Francisco after a visit to Fort Ord. Near the northerly city limits of Gilroy, at about 9:30 p.m., they stopped their car on the east side of Highway 101, opposite the Willows Café. At this point the highway is level, 60 feet wide, divided by a double white line in the center, and two single white lines forming a four-lane highway, the inner lanes 11 feet wide, the curb lanes 19 feet wide. The street was well lighted, the eve-

ning warm, clear and dry. Their car was parked parallel to and about 1 foot out from the east curb. Its lights were burning. Stanley got out and went over to the Willows Café to see if it was still open for business. Shortly thereafter decedent got out of the rear door on the left (street) side of the car, came up to the driver's window and talked through it to his daughter, sitting in the driver's seat, and his wife, sitting in the rear seat. Mrs. Newton testified that she "figured" he was standing "maybe 2 or 3 feet" from the car. Stanley came out of the café, saw decedent in that position. He shouted that the café was open and turned to go back into it. Stanley then saw no traffic. He took two or three steps, and then heard the scream of brakes and tires, and a crash, and saw decedent's body hurtling through space. Decedent had been talking to his wife and daughter for about one minute before Stanley called. He had just persuaded his wife to go over to the café and was in the middle of a sentence when the wife and the daughter heard the screech of brakes and a crash. Neither of the latter was looking directly at him at the time. Mrs. Newton was getting her purse and did not know if decedent had moved or not before he was hit. The daughter was looking at her mother. There was some conflict whether the daughter had seen her father turn away from the car. A police officer first testified that she told him he turned from the car to cross the street. However, on cross-examination he said that he thought she told him that, he could not recall. The written report she gave the officer at that time stated that decedent was standing by the car when hit.

Dorothy Littlejohn, 10 years old at the time of the accident (12 at the time of the trial), daughter of a bartender in the hotel owned and operated by the mayor of Gilroy, testified that she saw decedent take a couple of steps towards the café before the car hit him. However, on cross-examination she stated that her sister who was with her at the time of the accident told her to say that the man was walking. On redirect Dorothy said that her sister had also told her to tell the truth.

The automobile that struck decedent was owned by defendant J. Ben Thomas, who was a member of the Gilroy City Council. He and his wife were driving north to shut off irrigation water in their pasture north of town. There is a conflict as to who was driving. Thomas, at the scene of the accident, was asked by Miss Newton, "Where is the man that hit my daddy?" He replied, "Don't get excited, lady, here I am." A witness testified that as the car skidded sideways towards him, it appeared to have only one occupant—a woman

sitting on the *right* side. At the scene Mrs. Thomas claimed to be the driver and at the trial both defendants testified that she was. Thomas was intoxicated, but Mrs. Thomas had not been drinking. Both defendants testified that their car, with lights on, traveling 25 to 30 miles per hour, was in the most easterly lane about 18 inches east of the white line separating the two northbound lanes. Thomas said that all he saw just prior to the accident was a figure out of the corner of his eye. Mrs. Thomas testified that a figure appeared in front of her right front fender. She could not estimate how far he was in front of the car. She slammed on her brakes and turned the wheel to the left as hard as she could. She then heard a thud. Neither defendant could say whether they saw decedent move before he was struck nor in what direction he was facing. The skid marks commenced about 31 feet before the impact, and were virtually in a straight line until they passed the Newton car when they swung in an arc to the left. The measurements place the east skid mark 44 inches away from the Newton car at the point of impact opposite the left front door. The left skid mark was 3 feet east of the white line. After the impact the skid marks continued for 83 feet, indicating that the car swerved to the left and stopped in the most westerly lane facing in almost the opposite direction from which it came. The total length of the skid marks was 114 feet. A police officer estimated from the length of the skid marks that defendants' car was traveling approximately 50 miles per hour. Stanley, who saw it immediately after the impact, estimated it was going at that speed. An officer found a small heel mark similar to the impression made when a pedestrian is struck by an automobile. This mark was at a point 44 inches from the left front door of the Newton car. He determined this to be the point of impact. This places decedent approximately 10 feet 2 inches from the curb (1 foot, curb to car, 5½ feet width of car, plus 44 inches). The diagram of one of the officers, made at the scene of and immediately after the accident, had been altered by a person unknown. Among other alterations, it showed decedent to have been 15 feet 4 inches from the curb when hit. The marks of the car indicated that decedent was struck by the right front bumper and fender, lofted into the air, his head striking the right windshield.

1. *Contributory Negligence.*

(a) Business district.

Defendants contend that decedent was guilty of contributory negligence as a matter of law because of alleged violation of

sections of ordinance 480 of the city of Gilroy* which prohibits a pedestrian from (a) crossing a roadway *"in any business district"* other than by a crosswalk, (b) standing in a roadway "if such action interferes with the lawful movement of traffic," and (c) crossing a roadway other than by a route at right angles to the curb. (Emphasis added.) The court instructed the jury that if it should find that the scene of the accident was in a business district, then the above mentioned provisions of the Gilroy ordinance would apply. However, if the jury should find that it was not in a business district, the ordinance would not apply, and the jury should determine if plaintiff violated Vehicle Code, section 562, subdivision (a), which requires a pedestrian crossing at any point other than a crosswalk to "yield the right of way to all vehicles upon the roadway."

█ A violation of either the ordinance or the code section would constitute negligence as a matter of law. (See Prosser on Torts, 2d ed., ch. 5, § 34, p. 152, and *Satterlee* v. *Orange Glenn School Dist.*, 29 Cal.2d 581 [177 P.2d 279].) The first question to be determined under defendants' contention is whether the Gilroy ordinance applies as a matter of law. This depends upon whether or not as a matter of law the scene was in a business district as defined in the Vehicle Code, section 89: " 'Business district' is that portion of a highway and the property contiguous thereto (a) upon one side of which highway, for a distance of 600 feet, fifty per cent or more of the contiguous property fronting thereon is occupied by buildings in use for business. . . . A business district may be longer than the distances specified in this section if the above ratio of buildings in use for business to the length of the highway exists." The west side of the highway was occupied by a park, hence we are concerned here only with subdivision (a). Section 90.1 qualifies section 89 by providing: "(a) No building shall be regarded unless its entrance faces the highway and the front of the building is within 75 feet of the roadway. . . . (c) In determining the existence of a business or residence district, all churches, apartments, hotels, multiple dwelling houses, clubs and public buildings, other than schools, shall be deemed to be business structures." █ Where there is no dispute as to the type and character and number of the buildings in the area, the determination of whether or not the area constitutes

---

*Section 459.1, subdivison (a), Vehicle Code, specifically permits local authorities to enact ordinances prohibiting pedestrians from crossing roadways at other than crosswalks.

a business district is a question of law. However, if there is such conflict then the question becomes one of both law and fact—fact as to what and how many the buildings are—law as to whether the buildings as resolved in the conflict meet the requirements of the code. Here the trial court properly determined the question to be one of law and fact, because there was a dispute as to the type and character of the buildings.

Thomas measured the area and frontages thereon, and if his testimony and the conclusions defendants draw from it are correct, the district was a business one. On the other hand, under the testimony of Hyman, a Division of Highways Traffic Engineer, and the conclusions drawn therefrom by plaintiffs, it was not.

The first difference between the parties is whether in determining if 50 per cent of the 600-foot frontage is business, the building only is measured, or the lot on which it is located. Obviously it is buildings that must be measured. Otherwise, one small business building on a 300-foot lot would make the area a business district. Moreover, the section itself says "occupied by buildings in use for business."

The second difference relates to two motels, and is primarily concerned with the question of what constitutes "entrance" thereto under section 90.1. The Twin Palms Motel appears in a u-shape, the south leg being 30 feet wide, the north leg 20 feet wide. The back portion which seems to consist of separate buildings could not be counted as these buildings are more than 75 feet from the highway. Because the building constituting the south leg has a door facing the highway plaintiffs concede that it should be counted. However, the building constituting the north leg has no door facing the highway. There is a driveway from the street between the two legs from which entrance may be gained to either building. There is another motel fronting on the street but whose building has no door facing the street. This motel (actually a café and motel) has adjoining it a driveway from the street, by which entrance is gained to both the motel and the café. Thus whether this building and the north leg of the Twin Palms Motel should be counted depends upon whether the driveways constitute an "entrance" to the buildings under section 90.1

In defining the word "entrance" the purpose of the act must be considered. It is to provide safety in the use of vehicles in areas where there is a great deal of turning, slowing and congestion. To define "its entrance faces the highway" to mean that its entrance must be in the front of the

building is to unduly restrict the meaning of the act and to hamstring its evident purpose. Many business buildings fronting on a street have driveways coming from the street to a side entrance of the building. It is conceivable that a whole block of business buildings would have such entrances, and yet the area would not be considered a business area merely because the respective driveways came to the sides of the respective buildings instead of to their fronts. The traffic and congestion which the section has in mind would be equally great under the one condition as the other. It would be absurd to hold that a driveway coming from the street to the side of the building was not its entrance. ■ In *Adrian* v. *Guyette*, 14 Cal.App.2d 493 [58 P.2d 988], in determining "when property *fronts* on a highway" (p. 501) (the property in question was bounded by three different streets) the court held (p. 503): "It is clear that a building fronts on a highway when its principal means of ingress and egress with the connecting walks lead to that highway." It pointed out that the purpose of the Vehicle Act was "to impose upon motorists the duty of traveling at a low rate of speed in districts devoted principally to business where considerable congestion of vehicular traffic and pedestrians is to be expected" (pp. 503-504), and "The safety of those entering or leaving those buildings was one concern of the legislature in enacting speed regulations. Therefore, the frontage of the buildings and the use made of the structures erected on the land should determine the frontage of the entire property." Certainly the use of the street and the congestion of traffic is no more where the entrance to a building fronting on the highway is directly to the building than when the entrance thereto is by a driveway adjacent to the building and coming from the street. See 30 Corpus Juris Secundum 266, where "approach," "entry," "passage," have been included in the definition of "entrance."

■ The third difference between the parties is whether a duplex comes within the designation "multiple dwelling houses" which section 90.1 says must be counted as in use for business. The building in question Hyman called a "residence." Thomas and a police officer called it a "duplex." "Multiple" means "consisting of more than one." (Webster's Internat. Dict.) A duplex houses two families separately.

The fourth difference is as to the character of a 43-foot building which the witness Hyman said was a residence and Thomas testified was a rooming house. These were questions for the jury to determine.

To constitute the area in question a business district there must be at least 300 feet of buildings devoted to business use. The parties agree that the following building frontages qualify:

| | | |
|---|---|---|
| Building Supply Co. | 30 | feet |
| Twin Palms Motel (south leg) | 30 | feet |
| Willows Café | 80 | feet |
| Texaco Service Station | 12.5 | feet |
| Garage | 59.7 | feet |
| Lucille's Café | 25 | feet |
| Total | 237.2 | feet |

To this should be added the 20-foot width of the north leg of the Twin Palms Motel and the 15-foot width of the other motel and café. This would make a total of 272.2 feet which the evidence shows are occupied by buildings in use for business. Left for determination by the jury as to their character are the following:

| | | |
|---|---|---|
| Residence or duplex (discussed above) | 60.6 | feet |
| Residence or rooming house (discussed above) | 43 | feet |

If the jury considered both these structures as residences, then the business frontage, 272.2 feet, would not be equal to the 300-foot requirement of section 89. On the other hand, if the jury found that either or both of these structures were not residences, then, obviously, the business frontage would be sufficient to make the area a business district under the code. Thus, the character of the area was a mixed question of law and fact.

(b) Violation of law.

Assuming that the area was a business district, the jury had to determine under a conflict in the evidence whether decedent, when hit, was crossing the street, because defendants' contentions that decedent violated section 38 of the Gilroy ordinance (crossing a street except at a crosswalk) and section 39 (crossing other than at right angles) are based upon that assumption. ▮ No one other than Dorothy Littlejohn claimed to have seen decedent move from the position where he stood talking to the occupants of the car. Dorothy's credibility was a question for the jury. ▮ The burden of proving contributory negligence was on defendants. ▮ Additionally, they base their claim decedent was crossing on the testimony of Mrs. Newton that decedent was 2 or 3 feet from their car while talking to her, and the fact that the point of impact was

44 inches from the car, claiming that those facts corroborate Dorothy. Decedent was actually in the middle of a sentence (he was trying to get his wife to go to the café) when he was interrupted by a screech of the brakes. Whether these measurements under the circumstances prove that decedent had started to cross the street, or whether his movement of 8 to 20 inches was due to recoil from fright at hearing the brakes and seeeing the car rushing down on him, was a matter for the jury. We cannot say, as defendants ask us to do, that as a matter of law the evidence shows decedent when hit was in the act of crossing the street. ▮ A mere intention to cross is not a crossing. (See *Kuist* v. *Curran*, 116 Cal.App.2d 404, 409 [253 P.2d 281].) ▮ Nor can it be said that a person standing in the street is crossing it. (See *Dennis* v. *Gonzales*, 91 Cal.App.2d 203, 206 [205 P.2d 55].) ▮ Section 40 of the ordinance provides: "No person shall stand in any roadway . . . if such action interferes with the lawful movement of traffic." *Stricklin* v. *Rosemeyer*, 52 Cal.App.2d 558 [126 P.2d 665], held that an ordinance of the city and county of San Francisco making it unlawful "for any person to be in any roadway other than a safety zone" was invalid under the authority of *Pipoly* v. *Benson*, 20 Cal.2d 366, 372 [125 P.2d 482, 147 A.L.R. 515], which held that "the use of public roadways by pedestrian traffic is a 'matter covered' by the" Vehicle Code. Therefore section 40 is invalid and cannot be considered here. Section 562, subdivision (a), Vehicle Code, provides: "Every pedestrian crossing a roadway at any point other than within a marked crosswalk or within an unmarked crosswalk at an intersection shall yield the right of way to all vehicles upon the roadway."

If the area were found by the jury not to be a business district, then section 562, subdivision (a), would apply. However, as we pointed out before, it would be for the jury to determine whether decedent was crossing the roadway, or failed to yield the right of way.

2. *Adult Children Included.*

▮ Decedent's children, plaintiffs Florence M. Newton and George J. Newton, were both of age and employed. However, Florence testified without objection that at the time of the accident she was living with her parents, and derived companionship and advice from her father. Plaintiffs' attorney then stated that these two plaintiffs would waive any claim for damages and that they would ask that the case be submitted to the jury only on behalf of the mother. Nothing was

done about this statment. Defendants prior to this had submitted four instructions using the word "plaintiffs" when referring to the question of damages sought. The court throughout its instructions referred to "plaintiffs." While defendants' instructions were offered to the court prior to the above mentioned statement of plaintiffs to the effect that they would ask that the case be submitted to the jury only on behalf of the mother (which they never did), the fact that, without calling the court's attention to the situation, defendants permitted the case to go to the jury on the theory that damages to the adult children was an issue, bars them from now claiming error in this respect. Particularly is this so, when in moving for a nonsuit and later for a directed verdict, not one word was said concerning the waiver of damages, assuming that plaintiffs' statement amounted to such.* While the submission of this issue to the jury was probably an oversight on the part of all the parties and the court, defendants' responsibility in joining in the oversight denies them the right to claim error. The situation is governed by the rule that where a party joins in the submission of an issue to a jury it cannot thereafter attack that submission (see *Miller* v. *Dollar Steamship Lines, Inc.*, 19 Cal.App.2d 206, 211 [64 P.2d 1163]) and by the rule of "invited error" (see *Jentick* v. *Pacific Gas & Elec. Co.*, 18 Cal.2d 117, 121 [114 P.2d 343]).

3. *Instructions.*

(a) Business district.

Defendants contend that the court should have instructed that the scene of the accident was in a business district. As we have pointed out before, this was a question of mixed law and fact, fact as to what type of buildings were there, and law as to whether there were sufficient buildings to comprise a business district. The court instructed as to what a business district is and then told the jury that if it found from the evidence that it was not a business district the Gilroy ordinance would not apply. The court could not instruct that

---

*See *Lampton* v. *Davis Standard Bread Co.*, 48 Cal.App. 116, 120-121 [191 P. 710]. There the plaintiff's counsel, in argument, stated that with the court's permission he would dismiss the case against one of the defendants. Nothing was done, and the jury included that defendant in the judgment in favor of plaintiff. The court held that the statement of counsel did not act as a dismissal, and that the defendants had neither accepted the offer of dismissal nor requested the court to enter it in the minutes. "Not having pursued their ostensible advantage, and having remained silent until the opportunity offered was swept away by an adverse verdict and judgment, appellants are not in a position to complain." (P. 121.)

it was or was not a business district as a matter of law as it could not know which way the jury would resolve the conflict in the evidence as to the character of certain of the buildings. Defendants complain that the court did not instruct on what an "entrance" is and whether or not a duplex is a multiple dwelling. The court instructed in the language of sections 89 and 90.1, Vehicle Code. If defendants desired more specific instructions they should have requested them. (See *Ornales* v. *Wigger*, 35 Cal.2d 474, 478, 479 [218 P.2d 531] ; *Kuehn* v. *Lowthian*, 124 Cal.App.2d 867 [269 P.2d 666].)

(b) Section 562, subdivision (a), Vehicle Code.

The court read the provisions of the Gilroy ordinance and then section 562, subdivision (a). It then stated that conduct in violation of the Gilroy ordinance would constitute negligence *per se* and then discussed that presumption of negligence. ■ Unfortunately the court did not give defendants' proffered instruction that violation of section 562, subdivision (a), would constitute negligence as a matter of law. It should have done so. It did instruct that a violation of section 510, Vehicle Code (basic speed law) would be negligence *per se*. The court discussed section 562, subdivision (a), at some length and made it clearly appear that if the jury should find that decedent was attempting to cross the street and failed to comply with the section, namely, did not "yield the right of way to all vehicles upon the roadway," decedent was guilty of negligence. Under the circumstances here, the failure to give the requested instruction was not prejudicial.

(c) Ordinary care.

■ The court instructed that for decedent to have been contributively negligent he must be shown to have lacked ordinary care. The instruction is in proper form and the type usually given in contributory negligence cases. Defendants contend, however, that, in effect, it told the jury that even though decedent violated the ordinance or the Vehicle Code he would not be negligent unless defendants proved that in such violation he lacked ordinary care. ■ They correctly point out that as held in *Satterlee* v. *Orange Glenn School Dist., supra*, 29 Cal.2d 581, 588, where there is a violation of a statute or ordinance, "responsibility may be fixed upon the violator without other proof of failure to exercise due care." (P. 588.)

■ While this instruction taken alone would seem to have the effect claimed by defendants, when considered as a part of the whole and with the other instructions, as we are required to consider it (*Callet* v. *Alioto*, 210 Cal. 65, 70 [290 P. 438]),

it has no such effect. Actually, although there is no explicit statement that violation of section 562, subdivision (a), is negligence *per se,* the discussion of that section is so closely linked with the city ordinance and its violation as negligence *per se,* that the jury reasonably must have considered that a violation of that section also would be negligence.

(d) Justification.

The court gave an instruction relating to violation of the ordinance (it did not apply to a violation of the Vehicle Code) in the nature of BAJI instruction No. 149 relating to excuse or justification for violating it. Defendants contend, first, that it is erroneously worded in that where BAJI states, referring to a violator's conduct, "excusable, justifiable *and* such as might reasonably have been expected from a person of ordinary prudence," this instruction substituted "or" for "and." Such change when the instruction is considered with all the others was not prejudicial. Secondly, defendants contend that there was no evidence to excuse a violation of the ordinance, if one occurred. Mrs. Newton testified that decedent while talking to her (and he was struck while in the middle of a sentence) was standing 2 to 3 feet from the car door, yet apparently the point of impact was 44 inches from the door. Those facts are sufficient to raise an inference that decedent, seeing the automobile bearing down upon him, might have tried to cross the street to avoid being hit. This would be a justification for violation of the ordinance. Hence there was basis for the instruction. Moreover, defendants themselves included in their request for an instruction giving section 562, Vehicle Code, a statement that it would be negligence *per se* if decedent violated it "and such act on his part was neither justifiable nor excusable." Thus defendants were tendering the same issue on which they now complain the court instructed. If error, this was invited error and they may not now be permitted to complain of it. (*Miller* v. *Dollar Steamship Lines, supra,* 19 Cal.App.2d 206, 211; *Smith* v. *City & County of San Francisco,* 117 Cal.App.2d 749, 751 [256 P.2d 999].) Defendants try to excuse the offering of this instruction by claiming that they were merely meeting an issue tentered by instructions of plaintiffs. If, as they claim, there was no evidence to justify making this question an issue, they should not have included that issue in their instruction.

(e) Imminent peril.

Contending there was no evidence to support an instruction on imminent peril, defendants contend the court

erred in giving such an instruction. Here defendants denied negligence, and yet did not see decedent until they were upon him. Apparently decedent did not see them until they were dangerously close to him (if he ever saw them). The doctrine of sudden peril is proper in such a case. (See *Emery* v. *Los Angeles Ry. Corp.*, 61 Cal.App.2d 455, 462 [143 P.2d 112] ; *Fischer* v. *Keen*, 43 Cal.App.2d 244, 251 [110 P.2d 693].)

(f) Emergency.

Also contending that there was no evidence to support it, defendants complain of the giving of an instruction to the effect that a defendant cannot shield himself behind an emergency created by his own negligence. Defendants were driving at excessive speed and claimed not to have seen decedent who was in plain sight. This instruction was properly given as qualifying the instruction on imminent peril.

(g) Intoxication.

As pointed out before, there was evidence that Mr. Thomas was driving the car and that he was intoxicated. Defendants contend that the amendment of the complaint to conform to the proof took from the jury the issue of which defendant was driving. It did not do so. It charged that both defendants negligently drove the automobile, and then added that it was being driven under Mr. Thomas' supervision and control and for his benefit. Obviously, this latter allegation was to place liability upon Mr. Thomas, if the jury should find that Mrs. Thomas was the driver. Moreover, showing that defendants considered that the issue of who was driving was still before the jury is the fact that defendants requested a special finding on this issue. The court refused to require it, but did give the jury general verdict forms, one against both defendants, one against Mr. Thomas alone and one against Mrs. Thomas alone. The instruction on intoxication was properly given.

(h) Headlights.

The failure of defendants to see decedent prior to the accident even with the car's headlights on, raised an inference that the headlights might not have been adequate. That fact supports the giving of the instruction on the statutory requirements as to headlights. (See *Martindale* v. *Atchison, T. & S. F. Ry.*, 89 Cal.App.2d 400, 415-416 [201 P.2d 48].) This issue is properly embraced within the allegation in the complaint of negligent operation. (See *Carnahan* v. *Motor Transit Co.*, 65 Cal.App. 402, 408 [224 P. 143].)

(i) Sign.

The court refused an instruction that in determining whether the area was a business district, the fact that it was posted as a 35-mile per hour speed zone was immaterial. Defendants contend that because the Department of Public Works has authority to increase the speed limit from 25 miles per hour, in a business district, the jury could infer from the presence of the sign that it was not a business district. We fail to follow this reasoning. The department has the power to make the prima facie speed limit in *both* business and residence districts 35 miles per hour. Moreover, the jury was not instructed as to the basic speed limit in a business district and hence could not have determined that it was not such a district merely because its speed limit was 35 miles per hour. We see no error in refusing this instruction.

(j) Other instructions.

The court refused to give defendants' instruction 28, based on BAJI Number 201-C, and defendants' instruction 30, both dealing with the duty of a pedestrian on a street. Instruction 30 was not applicable as it related to the pedestrian's duty "before entering the highway." Number 28 could have been given. However, the court rather fully instructed upon the subject. We see no error in refusing to give this instruction. Defendants' instruction 19 based on BAJI Number 131 was to the effect that the fact of accident alone raises no inference of negligence. The substance of this instruction was covered by the other instructions given. Moreover, this is the type of instruction, the refusal to give which was held in *Stein* v. *United Railroads*, 159 Cal. 368, 373 [113 P. 663], not to be error as "A juror would know that such was the rule without instruction and it would seem absurd to burden the record with a formal statement of a truth so self-evident."

There was no error in refusing defendants' instruction 4 to the effect that in considering damages, sentiment and emotion must be eliminated, and defendants' 9 to the effect that the jury could not include court costs and attorneys' fees. The court fully instructed on the measure of damages, particularly that only the pecuniary loss could be considered, and giving the matters which could be considered in arriving at the damages. These instructions, like most of the others offered by defendants, contained correct statements of law.

However, a court is not required to give every instruction offered by a party nor to instruct in the party's language.

As long as the court fully instructs on all matters included in the party's proposed instructions which are properly included, the court has fulfilled its duty. A study of the instructions given here shows that the court fully and fairly covered all subjects.

. 4. *Alleged Errors.*

(a) Accident report.

 On cross-examination by defendants of Officer Owens, a witness for plaintiffs, the officer stated that Miss Newton told him that her father "turned from the car to cross the street." On redirect, he stated, "I think she told me that." Plaintiffs then confronted him with a written statement he had taken from Miss Newton wherein she said that her father was standing by the car. This statement, over objection, was read into evidence. Plaintiffs were entitled to contradict Owens in this manner. Section 2049, Code of Civil Procedure, provides that a party producing a witness "may contradict him by other evidence," that is, other than evidence of bad repute. Only that portion which dealt with Miss Newton's statement as to the position of her father was admissible. But defendants did not specifically object on this ground. They erroneously objected to the statement being used at all. Undoubtedly had the court been requested to confine the admission to the one portion of the statement only, it would have done so. Defendants contend that the report was highly inflammatory in nature. Actually there was nothing in it that was not testified to during the trial. There was no error here.

(b) Police reports.

 One of those contretemps which occasionally occur in the trial of cases occurred in connection with three police reports. One of them was Miss Newton's statement which we have just discussed. The other two were the customary accident report by Officers Owen and Silacci, and a written statement by Mrs. Thomas. The three were identified by Owens and marked defendants' Exhibit A for identification. Apparently when the jury went into the jury room to deliberate, these statements were inadvertently included with the exhibits in evidence. After the jury had rendered their verdict and been polled, defendants' counsel asked for the exhibits and then informed the court that exhibit A had been in the jury room. When asked when he became aware of that fact he stated: "I never did become aware of it. I had a hunch after—that we were in chambers, after the jury retired, and I

came out here, and I was looking to see where the exhibits were for identification, and there were none. I couldn't find any." He then said that at the time he started looking for this exhibit the jury had been out about 20 to 25 minutes. (The jury were out approximately two hours.) We have examined the exhibit and fail to find anything in it that was not testified to at the trial. We are satisfied that no prejudice resulted from the inadvertent giving of this exhibit to the jury. " . . . the fact that a paper, which should not properly be with the jury during their deliberations, has been sent to the jury room through inadvertence or accident, or even through error of the court, and not through the connivance or design of the prevailing party, does not require the setting aside of the verdict and the granting of a new trial if it does not appear that the paper was of a character to prejudice the unsuccessful party." (39 Am.Jur. 97-98, citing cases; see also *Thrall* v. *Smiley*, 9 Cal. 529, 537.) Moreover, defendants' counsel should have called the situation to the court's attention the moment he suspected that the jury had the exhibit. The court could have immediately demanded its return and could have admonished the jury, if they had examined the exhibit, to disregard its contents. ▓ As said in *Zibbell* v. *Southern Pac. Co.*, 160 Cal. 237, 253 [116 P. 513]: " . . . the rule is that when knowledge of such irregularity is made known in time to apply to the court to remedy or correct it, a party may not sit by in silence, taking chances of a favorable verdict, and after a hostile verdict, then, for the first time, be heard to complain."

### 5. Damages.

▓ The jury awarded $50,000. Decedent and his wife were each 54 years old. Their life expectancy was 18.09 years. Before taxes his earnings were $6,140 per year and had been increasing yearly. His burial expenses were $1,171.29. He was in good physical condition. He was devoted to his family with practically no outside interests in which his family did not participate. For us to hold the award excessive we must find that it was so large as to indicate passion or prejudice on the part of the jurors. (*Holder* v. *Key System*, 88 Cal. App.2d 925, 940 [200 P.2d 98].) ▓ Also "Another factor to be considered in cases involving damages for loss of a member of a family is that, although damages must be measured by the pecuniary loss to the plaintiffs, in fixing such loss the trier of the fact is not limited to proof of loss in dollars and cents, but may properly consider the pecuniary

value of the loss of such noneconomic interests of a family as loss of comfort, society and protection." (*Holder* v. *Key System, supra,* at p. 940.) It may be true, although the record does not show it, that decedent might have been required to retire in another 11 years. (We have no way of knowing that retirement at 65 is compulsory with the Securities & Exchange Commission, decedent's employer.) If so, decedent, of course, would have received retirement pay. We cannot say that the value of decedent under the tests to be applied, with an expectancy of 18.09 years of both himself and wife, even considering the possibility of retirement, was not the approximately $49,000 placed upon his life by the jury, left after payment of funeral expenses. To support their claim of excessiveness defendants cite *Wyseur* v. *Davis* (1922), 58 Cal. App. 598 [209 P. 213], and *Dickinson* v. *Southern Pac. Co.* (1916), 172 Cal. 727 [158 P. 183].) We do not deem it necessary to distinguish the facts of these cases. What we said in *Holder* v. *Key System, supra,* 88 Cal.App.2d at page 940, applies to them: "Analysis of awards made in other similar cases, while of assistance, is by no means conclusive, particularly when the cited cases are not of recent origin. 'It is a matter of common knowledge, and of which judicial notice may be taken, that the purchasing power of the dollar has decreased to approximately one-half what it was prior to the present inflationary spiral [citing cases], and the trier of fact should take this factor into consideration in determining the amount of damages necessary to compensate an injured person for the loss sustained as the result of the injuries suffered.' " Based upon the fact that in the two cases cited by defendants the court did not discuss or refer to the rule above mentioned to the effect that the amount of damages must indicate passion or prejudice before we can hold the verdict excessive, defendants cite those cases as holding that such rule applies only on motion for new trial and does not bind this court. Defendants have cited no case so holding. That the rule is binding on this court is well established. (See *Holder* v. *Key System, supra,* 88 Cal.App.2d 925, 940; see also 15 Cal.Jur.2d 42 and cases there cited.)

The judgment and order are affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied January 13, 1956, and appellants' petition for a hearing by the Supreme Court was denied February 8, 1956.